Ben F. Pierce Gore (SBN 128515)
PRATT & ASSOCIATES
1901 S. Bascom Avenue, Suite 350
Campbell, CA 95008
Telephone: (408) 429-6506
Fax: (408) 369-0752
pgore@prattattorneys.com

(Co-counsel listed on signature page)

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| LEON KHASIN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE HERSHEY COMPANY,<br><br>Defendant. | Case No. CV 12-01862 EJD<br><br>**AMENDED CLASS ACTION AND REPRESENTATIVE ACTION**<br><br>**COMPLAINT FOR DAMAGES AND EQUITABLE AND INJUNCTIVE RELIEF**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Leon Khasin ("Plaintiff"), through his undersigned attorneys, brings this lawsuit against Defendant The Hershey Company (hereinafter, "Hershey" or "Defendant") as to his own acts upon actual knowledge, and as to all other matters upon information and belief. In order to remedy the harm arising from Defendant's illegal conduct which has resulted in unjust profits, Plaintiff brings this action on behalf of a class of California consumers who purchased chocolate, cocoa and sugar free mint products manufactured or distributed by Hershey (hereinafter, "Misbranded Food Products") within the last four years.

**INTRODUCTION**

1.      Every day, millions of Americans purchase and consume packaged foods. To protect these consumers, identical California and federal laws require truthful, accurate information on the labels of packaged foods. This case is about a company that flouts those laws and sells misbranded foods to unsuspecting consumers. The law, however, is clear: misbranded food cannot legally be manufactured, held, advertised, distributed or sold. Misbranded food is worthless as a matter of law, and purchasers of misbranded food are entitled to a refund of their purchase price.

2.      Hershey is a multinational corporation with over 70 brands of products. According to Hershey's website, "The Hershey Company (NYSE: HSY) is the largest producer of quality chocolate in North America and a global leader in chocolate and sugar confectionery. Headquartered in Hershey, Pa., The Hershey Company has operations throughout the world and more than 12,000 employees. With revenues of more than $5 billion Hershey is a leader in the fast-growing dark and premium chocolate segment, with such brands as *HERSHEY SPECIAL DARK* and *HERSHEY EXTRA DARK*." Hershey products typically command premium prices compared to alternative options.

3.      As part of its overall marketing strategy, Hershey has recognized the desire of many of its consumers to maintain a healthier diet. Defendant recognizes that health claims drive sales and, consequently, actively promotes the health benefits of its chocolate and cocoa, including claims regarding the inclusion of flavonoids antioxidants, despite the fact that such claims are unlawful and have been the target of FDA enforcement actions. For example, at its website, Defendant claims:

> It's more than wishful thinking — chocolate can be good for you. Studies show that eating chocolate, primarily dark chocolate, may contribute to improved cardiovascular health. A source of natural flavanol antioxidants, dark chocolate and cocoa sit in the same good-for-you category as green tea and blueberries. That's because chocolate comes from cacao beans (or cocoa beans), which grow on the cacao tree and are full of natural plant nutrients. Most of the studies to date highlight dark chocolate because it has the highest percentage of cocoa solids, therefore delivering more flavanol antioxidants.
>
> The health benefits of high antioxidant foods have taken the scientific world — and the media — by storm. Recent studies suggest that the plant compounds,

which act as antioxidants in foods, may reduce the risk of many kinds of illness, from heart disease to cancer. Antioxidants like those found in dark chocolate and cocoa, called flavanols, have also been linked to some of the hallmarks of good cardiovascular health such as enhanced blood flow, healthy cholesterol levels and, in some cases, reduced blood pressure.

Dark chocolate and cocoa contain cell-protecting flavanol antioxidant compounds. Two tablespoons of natural cocoa have more antioxidant capacity than 3 ½ cups of green tea, ¾ cup of blueberries and 1 1/3 glasses of red wine.

http://www.thehersheycompany.com/nutrition-and-wellness/chocolate-101/antioxidants.aspx.

4.     Hershey also makes health nutrient claims directly on the packages of its Misbranded Food Products.  For example, the package front panel of certain Hershey Special Dark Kisses states that "Cocoa Is A Natural Source of Flavanol Antioxidants."

5.     The back panel further touts, "The natural antioxidants found in teas and certain fruits like berries and grapes can also be found in Hershey ® Kisses ® Special Dark ® Chocolates."  *See*, *e.g*. Hershey Kisses Special Dark mildly sweet chocolate classic bag 12oz (340g).

6.     Similarly, the label of numerous Hershey chocolate and cocoa products including Hershey Cocoa, Special Dark Cocoa, and Special Dark Chocolate state that those products can be part of a healthy diet, notwithstanding their high caloric value and the significant amount of sugars, carbohydrates, sodium, fats and saturated fats contained in those products.

7.     Defendant's website also makes unlawful contentions regarding the Misbranded Food Products. Defendant has made, and continues to make unlawful, unapproved, new drug claims, including antioxidant claims that are prohibited by law.  Defendant makes unapproved, new drug claims by using scientific publications commercially to promote its products to consumers.

8.     In promoting the health benefits of its products, including its chocolate and cocoa products, Hershey has purportedly adopted a "Code of Ethical Business Conduct."  These principals are Hershey's "Commitment to Consumers" and include the following provisions:

We must ensure that the products we produce are safe, comply with applicable laws and meet our standards.

. . .

MARKET OUR PRODUCTS ETHICALLY

We must never make misleading or false statements about our products or those of our competitors

We truthfully market, promote and advertise our products. This is consistent with our commitment to acting honestly in all our business affairs. All descriptions of our products, services and prices must be truthful and accurate, meaning we must:

> o   Make only fair, fact-based comparisons between our products and those of our competitors Never misstate the facts or mislead consumers through Company advertisements, labeling, packaging or promotions.

http://www.thehersheycompany.com/assets/pdfs/hersheycompany/English_txt.pdf.

Unfortunately, Hershey has failed to abide by this code in the product labeling, advertising and marketing of its products.

9.      If a manufacturer makes a claim on a food label, the label must meet certain legal requirements that help consumers make informed choices and ensure that they are not misled.  As described more fully below, Defendant has made, and continues to make, false and deceptive claims in violation of California and federal law that govern the types of representations that can be made on food labels.  These laws recognize that reasonable consumers are likely to choose products claiming to have a health or nutritional benefit over otherwise similar food products that do not claim such benefits.  More importantly, these laws recognize that the failure to disclose the presence of risk-increasing nutrients is deceptive because it conveys to consumers the net impression that a food makes only positive contributions to a diet, or does not contain any nutrients at levels that raise the risk of diet-related disease or health-related condition.

10. Under California law, which is identical to federal law, a number of Defendant's food labeling practices are unlawful because they are deceptive and misleading to consumers: These include:

A. Making unlawful nutrient content claims on the labels of food products that fail to meet the minimum nutritional requirements legally required for the nutrient content claims being made;

B. Making unlawful antioxidant claims on the labels of food products that fail to meet the minimum nutritional requirements legally required for the antioxidant claims being made;

C. Failing to abide by the standards of identities for its chocolate and cocoa products;

D. Failing to utilize the common or usual names of ingredients on its product labels;

E. Making unlawful sugar free claims and utilizing improper serving sizes;

F. Making unlawful and unapproved health claims about its products that are prohibited by law; and

G. Making unlawful claims that suggest to consumers that its products can prevent the risk or treat the effects of certain diseases like cancer or heart disease.

11. These practices are not only illegal but they mislead consumers and deprive them of the information they require to make informed purchasing decisions. Thus, for example, a mother who reads labels because she wants to feed her child healthy, nutritious foods would be mislead by Hershey's practices and labeling.

12. California and federal law have placed numerous requirements on food companies that are designed to ensure that the claims companies make about their products to consumers are truthful, accurate and backed by acceptable forms of scientific proof. When companies such as Hershey make unlawful nutrient content, antioxidant, or health claims that are prohibited by regulation, consumers such as Plaintiff are misled.

13. Identical California and federal laws regulate the content of labels on packaged food. The requirements of the federal Food Drug & Cosmetic Act ("FDCA") were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 109875, *et seq.* Under FDCA section 403(a), food is

"misbranded" if "its labeling is false or misleading in any particular," or if it does not contain certain information on its label or its labeling. 21 U.S.C. § 343(a).

14. Under the FDCA, the term "false" has its usual meaning of "untruthful," while the term "misleading" is a term of art. Misbranding reaches not only false claims, but also those claims that might be technically true, but still misleading. If any one representation in the labeling is misleading, then the entire food is misbranded, nor can any other statement in the labeling cure a misleading statement. "Misleading" is judged in reference to "the ignorant, the unthinking and the credulous who, when making a purchase, do not stop to analyze." *United States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 75 (9th Cir. 1951). Under the FDCA, it is not necessary to prove that anyone was actually misled.

15. Defendant has made, and continues to make, food label claims that are prohibited by California and federal law. Under California and federal law, Defendant's Misbranded Food Products cannot legally be manufactured, advertised, distributed, held or sold. Defendant's false and misleading labeling practices stem from its global marketing strategy. Thus, the violations and misrepresentations are similar across product labels and product lines.

16. In addition to the deceptive claims on its product labels, Hershey's website repeatedly makes improper and unlawful health claims. For example, the website states:

> A large number of recent studies have shown that several biomarkers of cardiovascular risk are influenced by flavonoid-rich foods. (8) The flavonoids subclass has been the subject of much research due to their antioxidant activity. While the flavanols found abundantly in cocoa, can act as antioxidants, they also have other physiologically important properties.
>
> **COCOA IN THE TEST TUBE**
>
> Numerous *in vitro* studies indicate that cocoa flavanols may mitigate risk factors for cardiovascular disease. The addition of dark chocolate to blood samples inhibited LDL oxidation even at low concentrations in the blood. (9-11) Purified cocoa flavanols reduced platelet activation and aggregation in blood in the presence of an activating agent.(12) Cocoa flavanols also led to a decrease in blood clotting and inflammation, not only through direct effects on platelet activation and aggregation, but also by moderating the production of eicosanoids, precursors of the inflammation process.(13)

*Amended Class Action Complaint*

**COCOA IN THE BODY**

The strong *in vitro* evidence of dark chocolate, cocoa and cocoa components in improving cardiovascular disease risk has led to a number of clinical trials with humans volunteers. Risk factors of interest include: platelet activity and eiscosanoid production, high blood pressure, endothelial function/nitric oxide production and blood cholesterol.

**Platelet activity:** Platelets carry blood clotting factors and are important for wound healing, but in the arterial endothelium, they can aggregate and cause plaques. A decrease in platelet activity is thus favorable to overall cardiovascular health. In one study, after drinking cocoa high in polyphenols, a reduction in platelet surface markers (PAC-1) was found, indicating decreased platelet activation. (14) A separate study showed cocoa consumption decreased the formation of platelet microparticles – which correlates positively with thrombotic, or blood clotting disorders. (14)

http://www.hersheys.com/nutrition-professionals/chocolate/chocolate-health-nutrition/health.aspx

17.     Hershey also asserts on its website that there is a direct correlation between dark chocolate consumption and "significantly reduced blood pressure." The website states:

How much dark chocolate do you recommend for people eat each day?

We don't know exactly but we have some studies underway to help determine this. In a study published in the Journal of the American Medical Association a few years ago, eating a small amount of dark chocolate every day for 12 weeks significantly reduced blood pressure in people with slightly elevated blood pressure. The amount of dark chocolate eaten each day was 6.3 grams. This is about the same amount of chocolate as in 1 ½ HERSHEY KISSES Brand SPECIAL DARK Chocolates.

http://www.hersheys.com/nutritionprofessionals/chocolate/Chocolate_FAQ.aspx

18.     The health claims stated by Defendant establish that its Misbranded Food Products are drugs under section 201(g)(1)(B) of 21 U.S.C. § 321(g)(1)(B), because they are intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease.  Hershey's products are not generally recognized as safe and effective for the above referenced uses and, therefore, the products are "new drugs" as defined by section 201(p) of 21 U.S.C. § 321(p). A new drug may not be legally marketed in the United States without prior approval from FDA as described in section 505(a) of 21 U.S.C. § 355(a). Hershey's has not sought or obtained such approval.

1

**PARTIES**

2  19.     Plaintiff Leon Khasin is a resident of San Jose, California who purchased Hershey

3  chocolate, cocoa and sugar free mint products including Hershey Cocoa, Special Dark Chocolate,

4  Milk Chocolate, Special Dark Kisses, Special Dark Cocoa and Ice Breaker Mint products in

5  California since 2008 and throughout the four (4) years prior to the filing of this Civil Action (the

6  "Class Period"). Plaintiff purchased more than $25.00 of the Misbranded Food Products during

7  the Class Period.

8  20.     Defendant, The Hershey Company, is a Delaware corporation with its principle

9  place of business at 100 Crystal A Drive, Hershey, Pennsylvania.

10  21.     Defendant is the leading producer of retail chocolate and cocoa food products,

11  including specifically, Hershey Milk Chocolate and Special Dark Chocolate Bars, Special Dark

12  Kisses, Special Dark Cocoa, Cocoa and Ice Breaker Mints. Defendant sells its Misbranded Food

13  Products to consumers through grocery and other retail stores as well as direct marketing through

14  its web page throughout California.

15

**JURISDICTION AND VENUE**

16  22.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)

17  because this is a class action in which: (1) there are over 100 members in the proposed class;

18  (2) members of the proposed class have a different citizenship from Defendant; and (3) the claims

19  of the proposed class members exceed $5,000,000 in the aggregate.

20  23.     The Court has jurisdiction over the federal claim alleged herein pursuant to 28

21  U.S.C. § 1331, because it arises under the laws of the United States.

22  24.     The Court has jurisdiction over the California claims alleged herein pursuant to 28

23  U.S.C. § 1367, because they form part of the same case or controversy under Article III of the

24  United States Constitution.

25  25.     Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to

26  28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, and is

27  between citizens of different states.

28

26.     The Court has personal jurisdiction over Defendant because a substantial portion of the wrongdoing alleged in this Amended Complaint occurred in California, Defendant is authorized to do business in California, has sufficient minimum contacts with California, and otherwise intentionally avails itself of the markets in California through the promotion, marketing and sale of merchandise, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

27.     Because a substantial part of the events or omissions giving rise to these claims occurred in this District and because the Court has personal jurisdiction over Defendant, venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b).

## FACTUAL ALLEGATIONS

**A.      Identical California And Federal Laws Regulate Food Labeling**

28.     Food manufacturers are required to comply with federal and state laws and regulations that govern the labeling of food products.  First and foremost among these is the FDCA and its labeling regulations, including those set forth in 21 C.F.R. § 101.

29.     Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements as its own and indicated that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state."  California Health & Safety Code § 110100.

30.     In addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations.  For example, food products are misbranded under California Health & Safety Code § 110660 if their labeling is false and misleading in one or more particulars; are misbranded under California Health & Safety Code § 110665 if their labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and regulations adopted thereto; are misbranded under California Health & Safety Code § 110670 if their labeling fails to conform with the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and regulations adopted thereto; are misbranded under California

*Amended Class Action Complaint*

Health & Safety Code § 110705 if words, statements and other information required by the Sherman Law to appear on their labeling are either missing or not sufficiently conspicuous; they are misbranded under California Health & Safety Code § 110725 if they fail to bear labels clearly stating the common or usual name of each ingredient they contain; they are misbranded under California Health & Safety Code § 110735 if they are represented as having special dietary uses but fail to bear labeling that adequately informs consumers of their value for that use; and they are misbranded under California Health & Safety Code § 110740 if they contain artificial flavoring, artificial coloring and chemical preservatives but fail to adequately disclose that fact on their labeling.

### B. FDA Enforcement History

31. In recent years, FDA has become increasingly concerned that food manufacturers have been disregarding food labeling regulations. To address this concern, the FDA elected to take steps to inform the food industry of its concerns and to place the industry on notice that food labeling compliance was an area of enforcement priority.

32. In October 2009, the FDA issued a Guidance For Industry: Letter regarding Point Of Purchase Food Labeling, ("FOP Guidance") to address its concerns about front of package labels. The 2009 FOP Guidance advised the food industry:

> FDA's research has found that with FOP labeling, people are less likely to check the Nutrition Facts label on the information panel of foods (usually, the back or side of the package). It is thus essential that both the criteria and symbols used in front-of-package and shelf-labeling systems be nutritionally sound, well-designed to help consumers make informed and healthy food choices, and not be false or misleading. The agency is currently analyzing FOP labels that appear to be misleading. The agency is also looking for symbols that either expressly or by implication are nutrient content claims. We are assessing the criteria established by food manufacturers for such symbols and comparing them to our regulatory criteria.

> It is important to note that nutrition-related FOP and shelf labeling, while currently voluntary, is subject to the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. Therefore, FOP and shelf labeling that is used in a manner that is false or misleading misbrands the products it accompanies. Similarly, a food that bears FOP or shelf labeling with a nutrient content claim that does not comply with the regulatory criteria for the claim as defined in Title 21 Code of Federal Regulations (CFR) 101.13 and Subpart D of Part 101 is

misbranded. We will consider enforcement actions against clear violations of these established labeling requirements. . .

… Accurate food labeling information can assist consumers in making healthy nutritional choices. FDA intends to monitor and evaluate the various FOP labeling systems and their effect on consumers' food choices and perceptions. FDA recommends that manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA laws and regulations. FDA will proceed with enforcement action against products that bear FOP labeling that are explicit or implied nutrient content claims and that are not consistent with current nutrient content claim requirements. FDA will also proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading.

33.     The 2009 FOP Guidance recommended that "manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA law and regulations" and specifically advised the food industry that it would "proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading."

34.     Despite the issuance of the 2009 FOP Guidance, Defendant did not remove the unlawful and misleading food labeling claims from its Misbranded Food Products.

35.     On March 3, 2010, the FDA issued an "Open Letter to Industry from [FDA Commissioner] Dr. Hamburg" ("Open Letter"). The Open Letter reiterated the FDA's concern regarding false and misleading labeling by food manufacturers. In pertinent part the letter stated:

In the early 1990s, the Food and Drug Administration (FDA) and the food industry worked together to create a uniform national system of nutrition labeling, which includes the now-iconic Nutrition Facts panel on most food packages. Our citizens appreciate that effort, and many use this nutrition information to make food choices. Today, ready access to reliable information about the calorie and nutrient content of food is even more important, given the prevalence of obesity and diet-related diseases in the United States. This need is highlighted by the announcement recently by the First Lady of a coordinated national campaign to reduce the incidence of obesity among our citizens, particularly our children.

With that in mind, I have made improving the scientific accuracy and usefulness of food labeling one of my priorities as Commissioner of Food and Drugs. The latest focus in this area, of course, is on information provided on the principal display panel of food packages and commonly referred to as "front-of-pack" labeling. The use of front-of-pack nutrition symbols and other claims has grown tremendously in recent years, and it is clear to me as a working mother that such information can be helpful to busy shoppers who are often pressed for time in making their food

selections . . . .

As we move forward in those areas, I must note, however, that there is one area in which more progress is needed. As you will recall, we recently expressed concern, in a "Dear Industry" letter, about the number and variety of label claims that may not help consumers distinguish healthy food choices from less healthy ones and, indeed, may be false or misleading.

At that time, we urged food manufacturers to examine their product labels in the context of the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. As a result, some manufacturers have revised their labels to bring them into line with the goals of the Nutrition Labeling and Education Act of 1990. Unfortunately, however, we continue to see products marketed with labeling that violates established labeling standards.

To address these concerns, FDA is notifying a number of manufacturers that their labels are in violation of the law and subject to legal proceedings to remove misbranded products from the marketplace. While the warning letters that convey our regulatory intentions do not attempt to cover all products with violative labels, they do cover a range of concerns about how false or misleading labels can undermine the intention of Congress to provide consumers with labeling information that enables consumers to make informed and healthy food choices . . For example:

- Nutrient content claims that FDA has authorized for use on foods for adults are not permitted on foods for children under two. Such claims are highly inappropriate when they appear on food for infants and toddlers because it is well known that the nutritional needs of the very young are different than those of adults.
- Claims that a product is free of trans fats, which imply that the product is a better choice than products without the claim, can be misleading when a product is high in saturated fat, and especially so when the claim is not accompanied by the required statement referring consumers to the more complete information on the Nutrition Facts panel.
- Products that claim to treat or mitigate disease are considered to be drugs and must meet the regulatory requirements for drugs, including the requirement to prove that the product is safe and effective for its intended use.
- Misleading "healthy" claims continue to appear on foods that do not meet the long- and well-established definition for use of that term.
- Juice products that mislead consumers into believing they consist entirely of a single juice are still on the market. Despite numerous admonitions from FDA over the years, we continue to see juice blends being inaccurately labeled as single-juice products.

These examples and others that are cited in our warning letters are not indicative of the labeling practices of the food industry as a whole. In my conversations with industry leaders, I sense a strong desire within the industry for a level playing field

and a commitment to producing safe, healthy products. That reinforces my belief that FDA should provide as clear and consistent guidance as possible about food labeling claims and nutrition information in general, and specifically about how the growing use of front-of-pack calorie and nutrient information can best help consumers construct healthy diets.

I will close with the hope that these warning letters will give food manufacturers further clarification about what is expected of them as they review their current labeling. I am confident that our past cooperative efforts on nutrition information and claims in food labeling will continue as we jointly develop a practical, science-based front-of-pack regime that we can all use to help consumers choose healthier foods and healthier diets.

36.     Notwithstanding the Open Letter, Defendant has continued to utilize unlawful food labeling claims despite the express guidance of the FDA in the Open Letter.

37.     In addition to its guidance to industry, the FDA has sent warning letters to the industry, including many of Defendant's peer food manufacturers, for the same types of unlawful nutrient content claims described above.

38.     In these letters dealing with unlawful nutrient content claims, the FDA indicated that, as a result of the same type of claims utilized by Defendant, products were in "violation of the Federal Food, Drug, and Cosmetic Act … and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR § 101)" and "misbranded within the meaning of section 403(r)(1)(A) because the product label bears a nutrient content claim but does not meet the requirements to make the claim."     These warning letters were hardly isolated as the FDA has issued numerous warning letters to other companies for the same type of food labeling claims at issue in this case; the same being released as public records discoverable and downloadable from the internet.

39.     The FDA stated that the agency not only expected companies that received warning letters to correct their labeling practices but also anticipated that other firms would examine their food labels to ensure that they are in full compliance with food labeling requirements and make changes where necessary. Hershey did not change the labels on its Misbranded Food Products despite that fact that Hershey knew or should have known of these warning letters to other companies for the same type of violations that Hershey commits with its labels on the products subject to this litigation.

40.     Defendant has turned a blind eye to the FDA's Guidance for Industry, A Food Labeling Guide which details the FDA's guidance on how to make food labeling claims. Defendant continues to utilize unlawful claims on the labels of its Misbranded Food Products. Despite all of the available warnings and detailed instructions, Defendant's Misbranded Food Products continue to run afoul of FDA guidance as well as California and federal law.

41.     Despite the FDA's numerous warnings to industry, Defendant has continued to sell products bearing unlawful food labeling claims without meeting the requirements to make them. Plaintiff did not know, and had no reason to know, that Defendant's Misbranded Food Products were misbranded and bore food labeling claims despite failing to meet the requirements to make those food labeling claims.  Similarly, Plaintiff did not know, and had no reason to know, that Hershey's Misbranded Food Products were misbranded because the package labeling on the products purchased by Plaintiff were misleading and false.

**C.     Defendant's Food Products Are Misbranded**

**1.     California and Federal Law Regulate Unlawful Nutrient Content Claims**

42.     Pursuant to Section 403 of the FDCA, a claim that characterizes the level of a nutrient in a food is a "nutrient content claim" that must be made in accordance with the regulations that authorize the use of such claims.  21 U.S.C. § 343(r)(1)(A).  California expressly adopted the requirements of 21 U.S.C. § 343(r) in Section 110670 of the Sherman Law.

43.     Nutrient content claims are claims about specific nutrients contained in a product. They are typically made on the front of packaging in a font large enough to be read by the average consumer.   Because consumers -including Plaintiff- rely upon these claims when making purchasing decisions, the regulations govern what claims can be made in order to prevent misleading claims.

44.     Section 403(r)(1)(A) of the FDCA governs the use of expressed and implied nutrient content claims on labels of food products that are intended for sale for human consumption. 21 C.F.R. § 101.13.

45.     21 C.F.R. § 101.13 provides the general requirements for nutrient content claims, which California has expressly adopted in California Health and Safety Code§ 110100.  Among

other requirements, 21 C.F.R. § 101.13 requires that manufacturers include certain disclosures when a nutrient claim is made and, at the same time, the product contains certain levels of unhealthy ingredients, such as fat and sodium. It also sets forth the manner in which that disclosure must be made, as follows:

> (4)(i) The disclosure statement "See nutrition information for ___ content" shall be in easily legible boldface print or type, in distinct contrast to other printed or graphic matter, and in a size no less than that required by §101.105(i) for the net quantity of contents statement, except where the size of the claim is less than two times the required size of the net quantity of contents statement, in which case the disclosure statement shall be no less than one-half the size of the claim but no smaller than one-sixteenth of an inch, unless the package complies with §101.2(c)(2), in which case the disclosure statement may be in type of not less than one thirty-second of an inch.
>
> (ii) The disclosure statement shall be immediately adjacent to the nutrient content claim and may have no intervening material other than, if applicable, other information in the statement of identity or any other information that is required to be presented with the claim under this section (e.g., see paragraph (j)(2) of this section) or under a regulation in subpart D of this part (e.g., see §§101.54 and 101.62). If the nutrient content claim appears on more than one panel of the label, the disclosure statement shall be adjacent to the claim on each panel except for the panel that bears the nutrition information where it may be omitted.

46.     An "expressed nutrient content claim" is defined as any direct statement about the level (or range) of a nutrient in the food (*e.g.*, "low sodium" or "contains 100 calories"). 21 C.F.R. § 101.13(b)(1).

47.     An "implied nutrient content claim" is defined as any claim that: (i) describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (*e.g.*, "high in oat bran"); or (ii) suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient (*e.g.*, "healthy, contains 3 grams (g) of fat"). 21 C.F.R. § 101.13(b)(2)(i-ii).

48.     These regulations authorize use of a limited number of defined nutrient content claims. In addition to authorizing the use of only a limited set of de*fine*d nutrient content terms on food labels, these regulations authorize the use of only certain synonyms for these defined terms. If a nutrient content claim or its synonym is not included in the food labeling regulations it c*anno*t

be used on a label. Only those claims, or their synonyms, that are specifically defined in the regulations may be used. All other claims are prohibited. 21 CFR § 101.13(b).

49.     Only approved nutrient content claims will be permitted on the food label, and all other nutrient content claims will misbrand a food. It is thus clear which types of claims are prohibited and which are permitted. Manufacturers are on notice that the use of an unapproved nutrient content claim is prohibited conduct. 58 FR 2302. In addition, 21 U.S.C. § 343(r)(2) prohibits using unauthorized undefined terms and declares foods that do so to be misbranded. Similarly, the regulations specify absolute and comparative levels at which foods qualify to make these claims for particular nutrients (*e.g.*, low fat . . . more vitamin C) and list synonyms that may be used in lieu of the defined terms. Certain implied nutrient content claims (*e.g.*, healthy) also are defined. The daily values ("DVs") for nutrients that the FDA has established for nutrition labeling purposes have application for nutrient content claims, as well. Claims are defined under current regulations for use with nutrients having established DVs; moreover, relative claims are defined in terms of a difference in the percent DV of a nutrient provided by one food as compared to another.  *See e.g.*, 21 C.F.R. §§ 101.13 and 101.54.

50.     In order to appeal to consumer preferences, Defendant has repeatedly made false and unlawful nutrient content claims about antioxidants and other nutrients that fail to utilize one of the limited defined terms. These nutrient content claims are unlawful because they fail to comply with the nutrient content claim provisions in violation of 21 C.F.R. §§ 101.13 and 101.54, which have been incorporated in California's Sherman Law. To the extent that the terms used by Defendant to describe antioxidants are deemed to be a synonym for a defined term like "contain" the claim would still be unlawful because, as these antioxidants  do not have established daily values, they cannot serve as the basis for a term that has a minimum daily value threshold as the defined terms at issue here do.

### a.     Defendant Makes Unlawful Nutrient Content Claims

51.     Defendant's claims concerning unnamed antioxidants, antioxidants and other nutrients are false and unlawful because they fail to comply with the nutrient content claim provisions in violation of 21 C.F.R. §§ 101.13 and 101.54, which have been incorporated in

California's Sherman Law. They are false because Defendant's use of a defined term is in effect a claim its products have met the minimum nutritional requirements for the use of that term when they have not.

52.     For example, claims that Hershey products have "more" antioxidants than other foods are unlawful because Defendant's products do not meet the minimum nutrient level threshold to make such a claim. Similarly, claims that Hershey's chocolate products are "a natural source of flavanol antioxidants" are unlawful.  They are also false because the terms have defined minimum nutritional thresholds so that, for example, a claim that a product "contains" a nutrient is a claim that the product has at least 10% of the daily value of that nutrient. By using defined terms improperly, Defendant has, in effect, falsely asserted that the products meet the minimum nutritional thresholds for the claims in question which its products do not. By using undefined terms such as "source" or "found", Defendant has, in effect, falsely asserted that its products meet at least the lowest minimum threshold for any nutrient content claim which would have been 10% of the daily value of the nutrient at issue.  Such a threshold represents the lowest level that a nutrient can be present in a food before it becomes deceptive and misleading to highlight its presence in a nutrient content claim.

53.     For example, the labels of Hershey's cocoa and chocolate products purchased by the Plaintiff have utilized two separate unlawful antioxidant nutrient content claims. The first is a claim that the particular products purchased by Plaintiff are a "Natural Source of Flavanol Antioxidants." The second is a claim that "[t]he natural antioxidants found in teas and certain fruits like berries and grapes can also be found in Hershey®'s Kisses®  Special Dark®." Both types of claims are unlawful antioxidant nutrient content claims.

54.     FDA enforcement actions targeting identical or similar claims to those made by Hershey have made clear the unlawfulness of such claims. For example, on March 24, 2011, the FDA sent Jonathan Sprouts, Inc. a warning letter where it specifically targeted a "source" type claim like the one used on Defendant's products. In that letter the FDA stated:

> Your Organic Clover Sprouts product label bears the claim "Phytoestrogen Source [.]" Your webpage entitled "Sprouts, The Miracle Food! - Rich in

Vitamins, Minerals and Phytochemicals" bears the claim "Alfalfa sprouts are one of our finest food sources of . . . saponin." These claims are nutrient content claims subject to section 403(r)(1)(A) of the Act because they characterize the level of nutrients of a type required to be in nutrition labeling (phytoestrogen and saponin) in your products by use of the term "source." Under section 403(r)(2)(A) of the Act, nutrient content claims may be made only if the characterization of the level made in the claim uses terms which are defined by regulation. However, FDA has not defined the characterization "source" by regulation. Therefore, this characterization may not be used in nutrient content claims.

55.    It is thus clear that a "source" claim like the one utilized on the labels Hershey's products such as those purchased by Plaintiff are unlawful because the "FDA has not defined the characterization 'source' by regulation" and thus such a "characterization may not be used in nutrient content claims." Such a claim characterizes the fact the cocoa or chocolate contain unnamed antioxidants at some undefined level. This type of claim is false because it falsely implies that the levels of nutrients in the food are capable of satisfying the minimum nutritional threshold established by regulation when they are not.

56.    Similarly, a claim that a nutrient is "found" in cocoa or chocolate is improper because it is either an undefined characterization that a nutrient is found in a food at some undefined level or because it is a synonym for a defined term like "contains" as there is no difference in meaning between the statement "cocoa contains flavanols" and the statement "flavanols are found in cocoa." Both characterize the fact the cocoa contains flavanols at some undefined level. The types of misrepresentations made above would be considered by a reasonable consumer like the Plaintiff when deciding to purchase the products.

57.    Claims that Hershey's cocoa or chocolate products "contain" "flavanol antioxidants" are unlawful and false because flavanols do not have an RDI and therefore Hershey's cocoa or chocolate products do not meet the minimum nutrient level threshold to make such a claim which is 10 percent or more of the RDI or the DRV per reference amount customarily consumed.

58.    Claims that Hershey's cocoa or chocolate products contain or are made with an ingredient that is known to contain a particular nutrient, or is prepared in a way that affects the content of a particular nutrient in the food, can only be made if it is a "good source" of the nutrient that is associated with the ingredient or type of preparation. Thus, Hershey's statements

on cocoa or chocolate products that the products are a "source" of "flavanol antioxidants" trigger a "good source" (10 percent or more of the RDI or the DRV per reference amount customarily consumed) which Hershey cannot demonstrate for flavanols. Similarly, Hershey's label claim that its cocoa products are a "[n]atural source of flavanol antioxidants" trigger a "good source" requirement (10 percent or more of the RDI or the DRV per reference amount customarily consumed) for "flavanol" antioxidants which cannot be established since there is no RDA or DRV for flavanols.

59. The nutrient content claims regulations discussed above are intended to ensure that consumers are not misled as to the actual or relative levels of nutrients in food products.

60. Plaintiff relied on Hershey's nutrient content claims when making his purchase decisions and was misled because he erroneously believed the implicit misrepresentation that the products he was purchasing met the minimum nutritional threshold to make such claims. Plaintiff would not have purchased these products had he known that the cocoa and chocolate products did not in fact satisfy such minimum nutritional requirements with regard to flavanols. Plaintiffs had other alternatives that lacked such ingredients and/or Plaintiff also had cheaper alternatives.

61. For these reasons, Defendant's nutrient content claims at issue in this Amended Complaint are false and misleading and in violation of 21 C.F.R. § 101.13 and California law, and the products at issue are misbranded as a matter of law. Defendant has violated these referenced regulations. Therefore, Defendant's Misbranded Food Products are misbranded as a matter of federal and California law and cannot be sold or held because they are legally worthless.

62. Plaintiff was thus misled by Defendant's unlawful labeling practices and actions into purchasing products he would not have otherwise purchased had they known the truth about those products. Plaintiffs had other alternatives and Plaintiff also had cheaper alternatives.

63. Defendant's claims in this respect are false and misleading and the products are in this respect misbranded under identical federal and California laws, Misbranded products cannot be legally sold and are legally worthless. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products.

**b.** **Special Requirements Must /Be Met For Unlawful Antioxidant Nutrient Claims**

64.     Hershey violates identical California and federal antioxidant labeling regulations.

65.     Both California and federal regulations regulate antioxidant claims as a particular type of nutrient content claim.  Specifically, 21 C.F.R. § 101.54(g) contains special requirements for nutrient claims that use the term "antioxidant":

(1)     the name of the antioxidant must be disclosed;

(2)     there must be an established RDI for that antioxidant, and if not, no "antioxidant" claim can be made about it;

(3)     the label claim must include the specific name of the nutrient that is an antioxidant and cannot simply say "antioxidants" (*e.g.*, "high in antioxidant vitamins C and E"), *see* 21 C.F.R. § 101.54(g)(4);

(4)     the nutrient that is the subject of the antioxidant claim must also have recognized antioxidant activity, *i.e.*, there must be scientific evidence that after it is eaten and absorbed from the gastrointestinal tract, the substance participates in physiological, biochemical or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions, *see* 21 C.F.R.  § 101.54(g)(2);

(5)     the antioxidant nutrient must meet the requirements for nutrient content claims in 21 C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and "More" claims, respectively.  For example, to use a "High" claim, the food would have to contain 20% or more of the Daily Reference Value ("DRV") or RDI per serving.  For a "Good Source" claim, the food would have to contain between 10-19% of the DRV or RDI per serving, *see* 21 C.F.R. § 101.54(g)(3); and

(6)     the antioxidant nutrient claim must also comply with general nutrient content claim requirements such as those contained in 21 C.F.R. § 101.13(h) that  prescribe the circumstances in which a nutrient content claim can be made on the label of products high in fat, saturated fat, cholesterol or sodium.

66.     Defendant's antioxidant claims on the packages of its Misbranded Food Products violate California and federal law because:  (1) the names of the antioxidants are not disclosed on

the product labels; (2) there are no RDIs for the antioxidants being touted, including flavonoids; (3) the claimed antioxidant nutrients fail to meet the requirements for nutrient content claims in 21 C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and "More" claims, respectively; (4) Hershey lacks adequate scientific evidence that the claimed antioxidant nutrients participate in physiological, biochemical, or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions after they are eaten and absorbed from the gastrointestinal tract, and (5) Hershey's chocolate and cocoa powder products, including "Special Dark" brands, undergo the process of dutching/alkalization thereby reducing or eliminating any alleged antioxidants.

67. For example, Hershey's Special Dark Chocolate Bars and Special Dark Kisses bear the statement "Natural Source of Flavanol Antioxidants," and its web page compares the antioxidant "power" of dark chocolate to other foods and states: "Data from a study conducted by The Hershey Company and previous studies from USDA and others indicate that, gram for gram; cocoa powder and chocolate are among the most concentrated sources of flavanol antioxidants. The antioxidant power of about 4 tasting squares (40 g/1.4 oz) of Hershey's Extra Dark chocolate is more than that of 4 cups of green tea, 1½ glasses of red wine or ¾ cup blueberries." www.hersheys.com/nutrition-professionals/chocolate/Chocolate_FAQ.aspx (emphasis added).

68. For these reasons, Hershey's antioxidant claims at issue in this Amended Complaint are misleading and in violation of 21 C.F.R. § 101.54 and California law, and the products at issue are misbranded as a matter of law. Misbranded products cannot be legally manufactured, advertised, distributed, held or sold and are legally worthless.

69. In addition to its guidance to industry, the FDA has sent warning letters to the industry, including many of Defendant's peer food manufacturers for the same types of unlawful nutrient content claims described above.

70. On August 23, 2010, the FDA sent a warning letter to Unilever, informing Unilever of its failure to comply with the requirements of the FDCA and its regulations, all of which have been expressly adopted by California in its Sherman Law. The FDA Warning Letter to Unilever stated, in pertinent part:

**Unauthorized Nutrient Content Claims**

Under section 403(r)(1)(A) of the Act [21 U.S.C. 343(r)(1)(A)], a claim that characterizes the level of a nutrient which is of the type required to be in the labeling of the food must be made in accordance with a regulation promulgated by the Secretary (and, by delegation, FDA) authorizing the use of such a claim. The use of a term, not defined by regulation, in food labeling to characterize the level of a nutrient misbrands a product under section 403(r)(1)(A) of the Act.

Nutrient content claims using the term "antioxidant" must also comply with the requirements listed in 21 CFR 101.54(g). These requirements state, in part, that for a product to bear such a claim, an RDI must have been established for each of the nutrients that are the subject of the claim (21 CFR 101.54(g)(1)), and these nutrients must have recognized antioxidant activity (21 CFR 101.54(g)(2). The level of each nutrient that is the subject of the claim must also be sufficient to qualify for the claim under 21 CFR 101.54(b), (c), or (e) (21 CFR 101.54(g)(3)). For example, to bear the claim "high in antioxidant vitamin C," the product must contain 20 percent or more of the RDI for vitamin C under 21 CFR 101.54(b). Such a claim must also include the names of the nutrients that are the subject of the claim as part of the claim or, alternatively, the term "antioxidant" or "antioxidants" may be linked by a symbol (e.g., an asterisk) that refers to the same symbol that appears elsewhere on the same panel of the product label, followed by the name or names of the nutrients with recognized antioxidant activity (21 CFR 101.54(g)(4)). The use of a nutrient content claim that uses the term "antioxidant" but does not comply with the requirements of 21 CFR 101.54(g) misbrands a product under section 403(r)(2)(A)(i) of the Act.

Your webpage entitled "Tea and Health" and subtitled "Tea Antioxidants" includes the statement, "LIPTON Tea is made from tea leaves rich in naturally protective antioxidants." The term "rich in" is defined in 21 CFR 101.54(b) and may be used to characterize the level of antioxidant nutrients (21 CFR 101.54(g)(3)). However, this claim does not comply with 21 CFR 101.54(g)(4) because it does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients. Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

This webpage also states that "tea is a naturally rich source of antioxidants." The term "rich source" characterizes the level of antioxidant nutrients in the product and, therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "rich source" could be considered a synonym for a term defined by regulation (e.g., "high" or "good source"), nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "tea is a naturally rich source of antioxidants" does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients, as required by 21 CFR 101.54(g)(4). Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

The product label back panel includes the statement "packed with protective FLAVONOID ANTIOXIDANTS." The term "packed with" characterizes the level of flavonoid antioxidants in the product; therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "packed with" could be considered a synonym for a term defined by regulation, nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "packed with FLAVONOID ANTIOXIDANTS" does not comply with 21 CFR 101.54(g)1 because no RDI has been established for flavonoids. Thus, this unauthorized nutrient content claim causes your product to be misbranded under section 403(r)(2)(A)(i) of the Act.

The above violations are not meant to be an all-inclusive list of deficiencies in your products or their labeling. It is your responsibility to ensure that all of your products are in compliance with the laws and regulations enforced by FDA. You should take prompt action to correct the violations. Failure to promptly correct these violations may result in regulatory actions without further notice, such as seizure and/or injunction.

We note that your label contains a chart entitled "Flavonoid Content of selected beverages and foods." The chart appears to compare the amounts of antioxidants in your product with the amount of antioxidants in orange juice, broccoli, cranberry juice and coffee. However, the information provided may be misinterpreted by the consumer because although the chart is labeled, in part, "Flavonoid Content," the y-axis is labeled "AOX"; therefore, the consumer might believe that the chart is stating the total amount of antioxidants rather than specifically measuring the amount of flavonoids in the product.

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm224509.htm

71. The types of misrepresentations made above would be considered by a reasonable consumer when deciding to purchase the products. Not only do Hershey's antioxidant, nutrient content and health claims regarding the benefits of "flavonoids" violate FDA rules and regulations, they directly contradict current scientific research, which has concluded: "[T]he evidence today does not support a direct relationship between tea consumption and a physiological AOX [antioxidant] benefit." This conclusion was reported by Dr. Jane Rycroft, Director of Lipton Tea Institute of Tea, in an article published in January, 2011, in which Dr. Rycroft states:

Therefore, despite more than 50 studies convincingly showing that flavonoids possess potent antioxidant activity *in vitro*, the ability of flavonoids to act as an antioxidant *in vivo* [in humans], has not been demonstrated. …

*Amended Class Action Complaint*

No evidence has been provided to establish that having antioxidant activity/content and/or antioxidant properties is a beneficial physiological effect.

Rycroft, Jane, "The Antioxidant Hypothesis Needs to be Updated", Vol. 1, *Tea Quarterly Tea Science Overview,* Lipton Tea Institute of Tea Research (Jan. 2011), pp. 2-3.

72.     This scientific evidence and consensus establishes the improper nature of Defendant's antioxidant claims as they cannot satisfy the legal and regulatory requirement that the nutrient that is the subject of the antioxidant claim must have recognized antioxidant activity, *i.e.*, there must be scientific evidence that after it is eaten and absorbed from the gastrointestinal tract, the substance participates in physiological, biochemical or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions, *see* 21 C.F.R. § 101.54(g)(2).

73.     Plaintiff relied on these unlawful antioxidant nutrient content claims when making his purchase decisions and was misled because they erroneously believed the implicit misrepresentation that the chocolate and cocoa products he was purchasing met the minimum nutritional threshold to make such antioxidant claims. This threshold represents the lowest level that a nutrient can be present in a food before it becomes deceptive and misleading to highlight its presence in a nutrient content claim. Plaintiff would not have purchased these products had he known that the products did not in fact satisfy such minimum nutritional requirements with regard to antioxidants.

74.     Plaintiff was misled into the belief that such claims were legal and had passed regulatory muster and were supported by science capable of securing regulatory acceptance. Because this was not the case, the Plaintiff was deceived.

75.     The failure to comply with the labeling requirements of 21 C.F.R. § 101.54 renders the Misbranded Food Products misbranded as a matter of California and federal law. Misbranded products cannot be legally sold and are legally worthless. Plaintiff and the Class nonetheless paid a premium for the Misbranded Food Products.

76.     These materials and advertisements not only violate regulations adopted by California such as 21 C.F.R. § 101.14, they also violate California Health & Safety Code § 110403 which prohibits the advertisement of products that are represented to have any effect on

enumerated conditions, disorders and diseases including cancer and heart diseases unless it has federal approval.

77.     In addition to the violations set forth above, 21 C.F.R. § 101.14, which has been adopted as California law, prohibits unapproved antioxidant related health claims and also makes it unlawful to place antioxidant health claims on products that are high in fat, saturated fat, cholesterol or sodium.  Hershey has violated 21 C.F.R. § 101.14 with respect to a number of chocolate products including, specifically, the Misbranded Food Products.

78.     Similarly, Hershey violated 21 C.F.R. § 101.13(h) which makes it unlawful to place antioxidant nutrient claims on products that are high in fat, saturated fat, cholesterol or sodium, without mandated disclosures of the high fat, saturated fat, cholesterol or sodium content.

### 3.     Defendant Makes Other Unlawful Nutrient Content Claims

79.     In addition, Hershey has repeatedly made unlawful nutrient content claims on products containing disqualifying levels of fat, saturated fat, cholesterol and sodium, because it has failed to include disclosure statements required by law that are designed to inform consumers of the inherently unhealthy nature of those products in violation of 21 C.F.R. § 101.13(h), which has been incorporated in California's Sherman Law.

80.     21 C.F.R. § 101.13(h)(1) provides that: "If a food … contains more than 13.0 g of fat, 4.0 g of saturated fat, 60 milligrams (mg) of cholesterol, or 480 mg of sodium per reference amount customarily consumed, per labeled serving, or, for a food with a reference amount customarily consumed of 30 g or less … per 50 g … then that food must bear a statement disclosing that the nutrient exceeding the specified level is present in the food…."

81.     Hershey Special Dark Chocolate Bars, Special Dark Kisses and Special Dark Cocoa make such claims despite disqualifying levels of unhealthy components without proper disclosure.

82.     The failure to include the required disclosure statement renders the products at issue misbranded as a matter of law.  Misbranded products cannot be legally held or sold and are legally worthless.

83.     For example, Defendant's Special Dark Chocolate Cocoa has disqualifying levels of sodium per 50 grams amount and the Special Dark Kisses have 40% saturated fat per serving which is a disqualifying amount.  These levels of sodium and saturated fat bar the making of a nutrient content claim without a saturated fat disclosure statement.

84.     Based on the fat, saturated fat, cholesterol and sodium content of these products, pursuant to California and federal law, Hershey must include a warning statement adjacent to the antioxidant nutrient claim that informs consumers of the high levels of fat, saturated fat, cholesterol or sodium.  No such saturated fat disclosure statement currently exists on these products.  Therefore, they are misbranded as a matter of California and federal law and cannot be sold because they are legally worthless.

85.     Plaintiff relied on these unlawful nutrient content claims when making his purchase decisions and was misled because he erroneously believed the implicit misrepresentation that the chocolate and cocoa products were healthy and did not contain disqualifying nutrients at levels the state of California and the FDA had concluded placed consumers at an elevated risk of a diet related disease or condition. Plaintiff would not have purchased these products had he known that the products contained nutrients at disqualifying levels the state of California and the FDA had concluded placed consumers at an elevated risk of a diet related disease or condition.

86.     Plaintiff was misled into the belief that such products were healthy and did not pose a risk of a diet related disease or condition and that Hershey's claims were legal and had passed regulatory muster. Because this was not the case, Plaintiff was deceived.

87.     The failure to comply with the labeling requirements of 21 C.F.R. § 101.13 renders the Misbranded Food Products misbranded as a matter of California and federal law. Misbranded products cannot be legally sold and are legally worthless. Plaintiff and the Class paid a premium for the Misbranded Food Products.

**4.     Defendant Violates California Law By Making Unlawful Health Claims**

88.     Hershey violated identical California and federal law by making numerous unapproved health claims about its products. It has also violated identical California and federal law by making numerous unapproved claims about the ability of its products to cure, mitigate,

treat and prevent various diseases that render its products unapproved drugs under California and federal law. Moreover, in promoting the ability of its products to have an effect on certain diseases such as cancer and heart disease among others, Defendant has violated the advertising provisions of the Sherman law.

89.    A health claim is a statement expressly or implicitly linking the consumption of a food substance (*e.g.*, ingredient, nutrient, or complete food) to risk of a disease (*e.g.*, cardiovascular disease) or a health-related condition (*e.g.*, hypertension). 21 C.F.R. §101.14(a)(1), (a)(2), and (a)(5). Only health claims made in accordance with FDCA requirements, or authorized by FDA as qualified health claims, may be included in food labeling. Other express or implied statements that constitute health claims, but that do not meet statutory requirements, are prohibited in labeling foods.

90.    21 C.F.R. § 101.14, which has been expressly adopted by California, provides when and how a manufacturer may make a health claim about its product.  A "Health Claim" means any claim made on the label or in labeling of a food, including a dietary supplement, that expressly or by implication, including "third party" references, written statements (*e.g.*, a brand name including a term such as "heart"), symbols (*e.g.*, a heart symbol), or vignettes, characterizes the relationship of any substance to a disease or health-related condition. Implied health claims include those statements, symbols, vignettes, or other forms of communication that suggest, within the context in which they are presented, that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition (*see* 21 CFR § 101.14(a)(1)).

91.    Further, health claims are limited to claims about disease risk reduction, and cannot be claims about the diagnosis, cure, mitigation, or treatment of disease. An example of an authorized health claim is: "Three grams of soluble fiber from oatmeal daily in a diet low in saturated fat and cholesterol may reduce the risk of heart disease. This cereal has 2 grams per serving."

92.    A claim that a substance may be used in the diagnosis, cure, mitigation, treatment, or prevention of a disease is a drug claim and may not be made for a food. 21 U.S.C. § 321(g)(1)(D).

93.    The use of the term "healthy" is not a health claim but rather an implied nutrient content claim about general nutrition that is defined by FDA regulation. In general, the term may be used in labeling an individual food product that:

> Qualifies as both low fat and low saturated fat;
> Contains 480 mg or less of sodium per reference amount and per labeled serving, and per 50 g (as prepared for typically rehydrated foods) if the food has a reference amount of 30 g or 2 tbsps or less;
>
> Does not exceed the disclosure level for cholesterol (*e.g.*, for most individual food products, 60 mg or less per reference amount and per labeled serving size); *and*
>
> Except for raw fruits and vegetables, certain frozen or canned fruits and vegetables, and enriched cereal-grain products that conform to a standard of identity, provides at least 10% of the daily value (DV) of vitamin A, vitamin C, calcium, iron, protein, *or* fiber per reference amount. Where eligibility is based on a nutrient that has been added to the food, such fortification must comply with FDA's fortification policy.

21 C.F.R. § 101.65(d)(2).

94.    FDA's regulation on the use of the term healthy also encompasses other, derivative uses of the term health (*e.g.*, healthful, healthier) in food labeling. 21 C.F.R. § 101.65(d).

95.    Hershey has violated the provisions of § 21 C.F.R. §101.14, 21 C.F.R. §101.65, 21 C.F.R. §101.76, 21 U.S.C. § 321(g)(1)(D) and 21 U.S.C. § 352(f)(1) by including certain claims on its product labeling and website.

96.    For example, Hershey unlawfully claims that products like its Special Dark Cocoa, Special Dark Chocolate and its Special Dark Kisses can all be part of a healthy diet.

97.    Hershey makes a number of other unlawful health claims. For example, it claims on its website that cocoa and chocolate may help reduce the risk of heart disease, may reduce inflammation, protect against cancer, help diabetes, help patients with heart failure, reduce the risk of a stroke, decrease plaque formation, have a beneficial impact on skin health, improve insulin sensitivity in insulin resistant individuals, decrease skin reddening cause by UV exposure, reduce LDL cholesterol levels and have "aspirin like effects." These claims are merely typical examples

of Hershey's widespread practice of making unlawful and unauthorized health claims. Hershey's website contains an abundance of instances where Hershey, like the snake oil salesmen of yore with their cure-all elixirs, promotes the ability of its products to preserve one's health and to prevent and cure all sorts of diseases and medical conditions.

98.     The therapeutic claims on Hershey's website establish that Hershey's products are drugs because they are intended for use in the cure, mitigation, treatment, or prevention of disease. Hershey's products are not generally recognized as safe and effective for the above referenced uses and, therefore, the products would be  "new drug[s]" under section 201(p) of the Act [21 U.S.C. § 321(p)]. New drugs may not be legally marketed in the U.S. without prior approval from the FDA as described in section 505(a) of the Act [21 U.S.C. § 355(a)]. FDA approves a new drug on the basis of scientific data submitted by a drug sponsor to demonstrate that the drug is safe and effective.

99.     Plaintiff saw such health related claims and relied on the Hershey's health claims which influenced his decision to purchase Defendant's products. Plaintiff would not have bought the products had he known Hershey's claims were unapproved and that the products were thus misbranded.

100.     Plaintiff and members of the Class was misled into the belief that such claims were legal and had passed regulatory muster and were supported by science capable of securing regulatory acceptance. Because this was not the case, the Plaintiff and members of the Class have been deceived.

101.     Hershey's materials and advertisements not only violate regulations adopted by California such as 21 C.F.R. § 101.14, they also violate California Health & Safety Code § 110403 which prohibits the advertisement of products that are represented to have any effect on enumerated conditions, disorders and disease including cancer and heart disease unless the claims have federal approval.

102.     Plaintiff and members of the Class have been misled by Hershey's unlawful labeling practices and actions into purchasing products they would not have otherwise purchased

had they known the truth about these products. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products.

103. Hershey's health related claims are false and misleading and the products are in this respect misbranded under identical federal and California laws. Misbranded products cannot be legally sold and thus are legally worthless.

104. Hershey's health claims were also improper because of their disqualifying levels of harmful nutrients like saturated fat and/or because of their inadequate nutritional profiles.

105. 21 C.F.R. § 101.14, which has been expressly adopted by California, prohibits manufacturers from making any health claim about products that have disqualifying levels of fat, saturated fat, cholesterol or sodium. The disqualifying levels are the same as those utilized in 21 C.F.R. § 101.13.

106. In addition, 21 C.F.R. § 101.65, which has been adopted by California, sets certain minimum nutritional requirements for making an implied nutrient content claim that a product is healthy. For example, for unspecified foods, the food must be low in fat, saturated fat, sodium and cholesterol and supply at least 10 percent of the RDI of one or more specified nutrients.

107. Hershey has misrepresented the healthiness of its products while failing to meet the regulatory thresholds for making such claims either because: (1) the products contain disqualifying amounts of fat, saturated fat, cholesterol or sodium that preclude the inclusion of any health claim on its label; or (2) the products lack minimum nutritional requirements to make such a claim.

108. Hershey food products, including the Misbranded Food Products, violate 21 C.F.R. § 101.14 or 21 C.F.R. § 101.65.

109. For example, the labels of Hershey Special Dark Chocolate Bars and Special Dark Kisses state that these products contain 7 and 8 grams of saturated fat per 36 and 41 gram serving sizes respectively which are disqualifying amounts of saturated fat. Similarly, these products fail to meet the minimal nutritional content requirements to make such health related claims as they are devoid of any of the required nutrients mandated by 21 C.F.R. § 101.65.

110. Likewise, Hershey's Special Dark Cocoa contains 65 milligrams of sodium per

serving which is a disqualifying amount of sodium under 21 C.F. R. § 101.65.

111.    The FDA has sent other chocolate companies warning letters for similar violations.

112.    On May 31, 2006, the FDA sent a warning letter to Masterfoods USA informing the company of its failure to comply with the requirements of the FDCA and its regulations, all of which have been expressly adopted by California in its Sherman Law. The FDA Warning Letter to Masterfoods stated, in pertinent part:

> The Food and Drug Administration (FDA) has reviewed the labels for several candy bar products in your Cocoa Via&#8482; product line. FDA's review found serious violations of the Federal Food, Drug, and Cosmetic Act (the Act) and regulations. You can find the Act and regulations at www.fda.gov.
>
> [ . . . ]
>
> In addition, your Cocoa Via&#8482; Original Chocolate Bars and Blueberry & Almond Chocolate Bars are misbranded under section 403(a)(1) of the Act [21 U.S.C. 343(a)(1)] because their labels bear false or misleading claims that the products promote heart health. For example, the labels of these products bear the claims "Promotes a Healthy Heart" and "Now you can have real chocolate pleasure with real heart health benefits." These claims are false or misleading because of the high levels of saturated fat in the products.
>
> The Original Chocolate Bars contain 3.5 grams of saturated fat per labeled serving (one bar weighing 22 grams), or approximately 6.4 grams per reference amount customarily consumed (40 grams) .1 The Blueberry & Almond Chocolate Bars contain 3 grams of saturated fat per labeled serving (one bar weighing 22 grams), or approximately 5.5 grams per reference amount (40 grams). Thus, each of these products contains more than 20% of the Daily Value (DV) for saturated fat (20 grams) per reference amount. A food that contains 20% or more of the DV of a nutrient per reference amount is high in that nutrient (see 21 CFR 101 .54(b)(1), defining "high"). Further, the labels of the Original Chocolate Bars and Blueberry & Almond Chocolate Bars recommend consuming two servings a day (i.e., two bars). Following this recommendation would result in consuming approximately one-third of the DV for saturated fat from these candy bars alone.
>
> The relationship between saturated fat intake and risk of coronary heart disease is well established (DHHS and USDA, Dietary Guidelines for Americans, 2005, 6th Edition, Washington, D.C., U.S. Government Printing Office, January 2005). Because of their high levels of saturated fat, your Original Chocolate Bars and Blueberry & Almond Chocolate Bars do not promote a healthy heart when consumed daily as recommended on the product label, even though the products also contain ingredients, such as plant sterol esters, that have been shown to lower LDL cholesterol when consumed as part of a low

*Amended Class Action Complaint*

fat, low cholesterol diet. As a matter of fact, the regulation authorizing a health claim for plant stero/stanol esters and reduced risk of heart disease includes the requirement that the food bearing the claim be low in saturated fat (1 g or less of saturated fat per reference amount and not more than 15% of calories from saturated fatty acids) [21 CFR 101.83(c)(2)(iii)(B)].

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2006/ucm075927.htm#.T0cCN6wTmHw.email

113.    On September 15, 2011, the FDA sent a Warning Letter to TCHO, informing TCHO of its failure to comply with the requirements of the FDCA and its regulations, all of which have been expressly adopted by California in its Sherman Law.

114.    The warning letter stated in pertinent part:

The Food and Drug Administration (FDA) reviewed your website at the internet address www.tcho.com in September 2011. FDA's review of your website found serious violations of the Federal Food, Drug, and Cosmetic Act (the Act), as discussed in detail below.

[ . . .]

**Unapproved New Drugs**

Based on our review of your website, we have determined that your chocolate products, including your TCHO-A-DAY product line, are promoted for conditions that cause them to be drugs within the meaning of section 201(g)(1)(B) of the Act [21 U.S.C. § 321(g)(1)(B)]. The therapeutic claims on your website establish that your chocolate products are drugs because they are intended for use in the cure, mitigation, treatment, or prevention of disease. The marketing of these products with these claims violates the Act.

Examples of claims on your website include the following:

From your homepage under the heading "Chocolates" and the sub-heading "Healthy Chocolate":

    TCHO-A-DAY 30, 60, and 90
•        "A growing body of scientific research has shown dark chocolate has a wide range of health benefits relating to: . . . diabetes, anti-inflammatory effects . . . tooth decay."

Your website makes further claims with respect to dark chocolate and chocolate in general, including but not limited to the following:

From your homepage under the heading "Blog" and the sub-heading "The Mind of TCHO":

*Amended Class Action Complaint*

- "[C]hocolate lowers blood pressure."
- "[D]ark chocolate . . . helps decrease blood pressure"
- "Dark Chocolate May Help Reduce Dangers For Cirrhosis Patients"
- "[E]ating certain kinds of chocolate may actually prolong the lives of people with cirrhosis and other forms of advanced liver disease."
- "Dark Chocolate . . . can help alleviate . . . depression . . . ."
- "Heart-attack survivors who ate chocolate just twice a week . . . cut their risk of dying from heart disease threefold."

From your homepage under the heading "Blog" and the sub-heading "Chocolate and Health":

- "[D]ark Chocolate May Guard Against Brain Injury From Stroke"
- "Chocolate . . . lower[s] blood pressure, study finds."
- "Cocoa can decrease blood pressure"
- "Chocolate protects against cardiac mortality following myocardial infarction" Furthermore, your TCHO 30 label on the website bears a "Good Drug Facts" panel which lists the following active ingredients: Theobromine, Trytophan [sic], Flavanols, Phenethylamine, and Love.

In addition, your website references and links to numerous scientific studies on the relation of chocolate and cognition, antioxidant activity, behavior, bioavailability, blood pressure, cardiovascular health, anti-inflammation, diabetes, immune health, and dermatology.

When scientific publications are used commercially by the seller of a product to promote the product to consumers, such publications may become evidence of the product's intended use. The following are examples of reference citations used to market your product for disease treatment and prevention on your website and are thus evidence of your products' intended use as drugs:

From your homepage under the heading "Chocolates" and the sub-heading "Healthy Chocolate":

- "Sustained benefits in vascular function through flavanol-containing cocoa in medicated diabetic patients: a double-masked, randomized, controlled trial. Journal of American College of Cardiology. June 2008; 51(22): 2141-2149. Balzer, J., Rassaf, T., Heiss, C., Kleinbongard, P."
- "Effects of cocoa flavanols on risk factors for cardiovascular disease. Asia Pacific Journal of Clinical Nutrition. 2008. 17 Suppl 1: 284-287.
- Erdman, J., Carson, L., Kwik-Uribe, C., Evans, E., Allen, R."

The claims listed above establish that your products are drugs under section 201(g)(1)(B) of the Act [21 U.S.C. § 321(g)(1)(B)], because they are intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease. Your products are not generally recognized as safe and effective for the above referenced uses and, therefore, the products are "new drugs" as defined by section 201(p) of the Act [21 U.S.C. § 321(p)]. A new drug may not be legally marketed in the United States without prior approval from FDA as described in section 505(a) of the Act [21 U.S.C. § 355(a)]. FDA approves a new drug on the basis of

scientific data submitted to a drug sponsor to demonstrate that the drug is safe and effective.

**Misbranded Drugs**

Because your chocolate products are being offered for conditions that are not amenable to self-diagnosis and treatment by individuals who are not medical practitioners, adequate directions cannot be written so that a layman can use these products safely for their intended uses. Thus, your product labeling fails to bear adequate directions for the products' intended uses, causing the products to be misbranded under section 502(f)(1) of the Act [21 U.S.C. § 352(f)(1)]. The introduction of a misbranded drug into interstate commerce is a violation of section 301(a) of the Act, [21 U.S.C. § 331(a)].

**Misbranded Food**

Your chocolate products are further misbranded within the meaning of section 403(r)(1)(B) of the Act [21 U.S.C. § 343(r)(1)(B)] because their labeling bears health claims that have not been authorized by regulation or the Act. Your website, www.tcho.com, bears the following unauthorized health claims:

From your homepage under the heading "Blog" and the sub-heading "The Mind of TCHO":
- "Chocolate's protective natural substances . . . help prevent cholesterol from sticking to your artery walls, reducing your risk of heart attack and stroke."

From your homepage under the heading "Blog" and the sub-heading "Chocolate and Health":
- "Chocolate reduces the risk of stroke or heart attack by increasing flow of blood around the brain . . . ."

This health claim misbrands your product because it has not been authorized either by regulation [see section 343(r)(3)(A)-(B) of the Act [21 U.S.C. § 343(r)(3)(A)(B)]] or under authority of the health claim notification provision of the Act [see section 343(r)(3)(C) of the Act [21 U.S.C. § 343(r)(3)(G)]].

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2011/ucm277253.htm (emphasis added).

115. The failure to comply with the labeling requirements of 21 C.F.R. § 101.14 or 21 C.F.R. § 101.65 renders Hershey's products misbranded as a matter of California and federal law. Misbranded products cannot be legally sold and are legally worthless.

116. Plaintiff relied on these unlawful health claims when making his purchase decisions and was misled because he erroneously believed the implicit misrepresentation that the chocolate

and cocoa products were healthy and did not contain disqualifying nutrients at levels the state of California and the FDA had concluded placed consumers at an elevated risk of a diet related disease or condition. Plaintiff would not have purchased these products had he known that the products contained nutrients at disqualifying levels the state of California and the FDA had concluded placed consumers at an elevated risk of a diet related disease or condition.

117.    Plaintiff was misled into the belief that such products were healthy and did not pose a risk of a diet related disease or condition and that Hershey's claims were legal and had passed regulatory muster. Because this was not the case the Plaintiff was deceived.

118.    The failure to comply with the labeling requirements of 21 C.F.R. § 101.13 renders the Misbranded Food Products misbranded as a matter of federal and California law. Misbranded products cannot be legally sold and are legally worthless. Plaintiff and the Class paid a premium for the Misbranded Food Products.

### 5.    Defendant Violates California Law By Making Unlawful "Sugar Free" Nutrient Claims

119.    Identical federal and California regulations regulate sugar free or sugarless claims as a particular type of nutrient content claim.  Specifically, 21 C.F.R. § 101.60 contains special requirements for nutrient claims that use the terms "sugar free" or "sugarless."  Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements of 21 C.F.R. § 101.60 as its own.  California Health & Safety Code § 110100.

120.    21 C.F.R. § 101.60(c)(1) provides that:

Sugar content claims—(1) Use of terms such as "sugar free," "free of sugar," "no sugar," "zero sugar," "without sugar," "sugarless," "trivial source of sugar," "negligible source of sugar," or "dietary insignificant source of sugar." Consumers may reasonably be expected to regard terms that represent that the food contains no sugars or sweeteners e.g., "sugar free," or "no sugar," as indicating a product which is low in calories or significantly reduced in calories. Consequently, except as provided in paragraph (c)(2) of this section, a food may not be labeled with such terms unless: (i) The food contains less than 0.5 g of

sugars, as defined in § 101.9(c)(6)(ii), per reference amount customarily consumed and per labeled serving or, in the case of a meal product or main dish product, less than 0.5 g of sugars per labeled serving; and (ii) The food contains no ingredient that is a sugar or that is generally understood by consumers to contain sugars unless the listing of the ingredient in the ingredient statement is followed by an asterisk that refers to the statement below the list of ingredients, which states "adds a trivial amount of sugar," "adds a negligible amount of sugar," or "adds a dietary insignificant amount of sugar;" and (iii)(A) It is labeled "low-calorie" or "reduced calorie" or bears a relative claim of special dietary usefulness or bears a relative claim of special dietary usefulness labeled in compliance with paragraphs(b)(2), (b)(3), (b)(4), or (b)(5) of this section, or, if a dietary supplement, it meets the definition in paragraph (b)(2)of this section for ''low calorie'' but is prohibited by §§101.13(b)(5) and101.60(a)(4) from bearing the claim or (B) Such term is immediately accompanied, each time it is used, by either the statement "not a reduced calorie food," "not a low-calorie food," or "not for weight control."

121.    21 C.F.R. § 101.60(b)(2) provides that the terms "low-calorie," "few calories," "contains a small amount of calories," "low source of calories," or "low in calories" may be used on the label or in labeling of foods, except meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that: (i)(A) The food has a reference amount customarily consumed greater than 30 grams (g) or greater than 2 tablespoons and does not provide more than 40 calories per reference amount customarily consumed; or (B) The food has a reference amount customarily consumed of 30 g or less or 2 tablespoons or less and does not provide more than 40 calories per reference amount customarily consumed and, except for sugar substitutes, per 50 g ….(ii) If a food meets these conditions without the benefit of special processing, alteration, formulation, or reformulation to vary the caloric content, it is labeled to clearly refer to all foods of its type and not merely to the particular brand to which the label attaches (e.g., "celery, a low-calorie food").

122.    None of Defendant's sugar free mints are low-calorie or suitable for weight control as they all contain more than the 40 calories per 50 grams which is the maximum amount allowed under 21 C.F.R. § 101.60(b)(2).

123.    For example, Hershey's Ice Breaker sugar free mints have 187.5 calories per 50 grams and Ice Breaker Duo sugar free mints have 150 calories per 50 grams. All varieties of Defendant's sugar free mints have at least 150 calories per 50 grams as well. Yet the label on each of these products contains a statement "sugar free" without the FDA required disclosure "not a reduced calorie food," "not a low-calorie food," or "not for weight control."

124.    Notwithstanding the fact that 21 C.F.R. § 101.60(c)(1) bars the use of the terms "sugar free" or "sugarless" on foods that are not low-calorie unless they bear an express warning immediately adjacent to each use of the terms that discloses that the food is "not a reduced calorie food," or "not a low-calorie food," or "not for weight control," Defendant has touted their non low-calorie products as sugar free and has chosen to omit the mandated disclosure statement.

125.    In doing so Defendant has ignored the language of 21 C.F.R. § 101.60(c)(1) that states:

> Consumers may reasonably be expected to regard terms that represent that the food contains no sugars or sweeteners e.g., "sugar free," or "no sugar," as indicating a   product which is low in calories or significantly reduced in calories.

126.    Because consumers may reasonably be expected to regard terms that represent that the food contains no sugars or sweeteners (e.g., "sugar free," or "sugarless") as indicating a product which is low in calories or significantly reduced in calories, Plaintiff and the Class were misled when foods that are not low-calorie as a matter of law were falsely represented to be low-calorie through the unlawful use of terms like "sugar free and sugarless that they are not allowed to bear due to their high calorific levels and absence of mandated disclosure statements.

127.    In addition, as discussed *infra,* because of its failure to use the mandated serving size on is mints, Defendant has failed to comply with the nutritional labeling requirement of 21 C.F.R. § 101.9 which is a prerequisite for making a sugar free claim or a statement of dietary usefulness. Similarly, Defendant has failed to include a "conspicuous" statement of dietary

usefulness explaining the basis for the claim. Defendant has also failed to indicate on its label the fact that its products are sweetened with nutritive and non-nutritive sweeteners.

128. The labeling of Defendant's products violates California and federal law. For these reasons, Defendant's sugar free claims at issue in this Amended Complaint are misleading and in violation of 21 C.F.R. § 101.60 and California law, and the products at issue are misbranded as a matter of law. Misbranded products cannot be legally sold and are legally worthless.

129. Defendant has also made the same illegal claims on their websites and advertising in violation of California and federal law.

130. In September 2007, the FDA issued a guidance letter to the food industry that indicated the FDA was concerned about unlawful sugar free type claims "that fail to bear the required disclaimer statement when these foods are not "low" or "reduced in" calories or fail to bear the required disclaimer statement in the location or with the conspicuousness required by regulation." The letter stated:

Dear Manufacturer:

The Food and Drug Administration (FDA) is concerned about the number of products we have seen that contain claims regarding the absence of sugar, such as, "sugar free" but that fail to bear the required disclaimer statement when these foods are not "low" or "reduced in" calories or fail to bear the required disclaimer statement in the location or with the conspicuousness required by regulation. As part of our continuing effort to reduce the incidence of obesity in the United States, FDA wants to ensure that consumers are provided with the label information they need to make informed choices for maintaining a healthy diet. We are highlighting accurate claims about the absence of sugar as a regulatory priority. The agency intends to take appropriate action against products that we encounter that bear a claim about the absence of sugar (e.g., sugar free) but that fail to meet each of the requirements of the regulation that defines "sugar free." We intend to pay particular attention to those foods that are required to bear a disclaimer statement under the regulation that defines "sugar free," but that fail to do so or otherwise fail to comply with the regulation, 21 CFR 101.60(c). Therefore, we are taking this opportunity to remind food manufacturers and distributors of conventional food products that the definition of "sugar free" includes several requirements.

Under the authority of the Nutrition Labeling and Education Act of 1990, FDA issued regulations for the nutrient content claim "sugar free" 58 Federal Register

*Amended Class Action Complaint*

(FR) 2302 at 2415. "Sugar free" is defined in Title 21 of the Code of Federal Regulations 101.60(c) …

FDA has historically taken the position that consumers may associate claims regarding the absence of sugar with weight control and with foods that are low-calorie or that have been altered to reduce calories significantly. Therefore, the definition for "sugar free" includes the requirement that any food that is not low or reduced in calorie disclose that fact. Without such information some consumers might think the food was offered for weight control. See 56 FR 60421 at 60435. Consequently, the definition for "sugar free" includes the requirement that the food be labeled with the claim "low-calorie" or "reduced calorie" or bear a relative claim of special dietary usefulness labeled in compliance with 21 CFR 101.60(b)(2), (b)(3), (b)(4), or (b)(5) or such claim is immediately accompanied, each time it is used, by one of the following disclaimer statements: "not a reduced calorie food," "not a low-calorie food," or "not for weight control" (see 21 CFR 101.60(c)(1)(iii)). The disclaimer statement, when required, must accompany the claim each time it is used. In addition, the disclaimer statement is subject to the requirements of 21 CFR 101.2(c) and must appear prominently and conspicuously but in no case may the letters be less than one-sixteenth inch in height.

FDA encourages food manufacturers and distributors to review their labels and ensure that any food that bears a claim regarding the absence of sugar meet each of the requirements for that claim including the placement and conspicuousness of the disclaimer statement in 21 CFR 101.60(c)(1)(iii) when required. FDA will take appropriate action, consistent with our priorities and resources, when we find problems with the use of nutrient content claims regarding the absence of sugar in foods.

131.    Defendant has ignored this FDA guidance and has engaged in the exact labeling practices the FDA sought to eliminate.

132.    In addition to the industry guidance which Defendant has ignored, the FDA has repeatedly taken enforcement action and issued warning letters against several other companies addressing the type of misleading sugar free and sugarless nutrient content claims described above.

133.    The enforcement actions and warning letters were not isolated, as the FDA has taken action against several companies finding that the products were misbranded within the meaning of section 403 because the products' labels bore "sugar free" claims but did not meet the requirements to make such a claim.

134.    Defendant has ignored the FDA's repeated enforcement actions and issuance of warning letters and continued to use unlawful sugar free and sugarless claims on their product labels and in their advertising and marketing materials when it knows it is prohibited from doing

so.

135.    Plaintiff did not know, and had no reason to know, that Defendant's Misbranded Food Products were misbranded, and bore nutrient content claims failing to meet the requirements to make those nutrient content claims. Plaintiff was equally unaware that Defendant's Misbranded Food Products contained the high caloric levels that were obscured by Defendant's labeling practices.

136.    Defendant's labeling of its purportedly sugar free products misled the Plaintiff and other class members who relied on Defendant's' sugar free labeling. Plaintiff and other Class members have been misled as to the amount of sugar in the product which is many times higher than the maximum allowed in a sugar free product labeled in the manner that Defendant's purportedly sugar free products are labeled. Plaintiff and other Class members would not have bought the sugar free products had they known they were incapable of making the sugar free claims because of their high caloric value. Plaintiff and the Class paid a premium for the Misbranded Food Products.

137.    The failure to comply with the labeling requirements of 21 C.F.R. §§ 101.60 and 105.66 renders the Misbranded Food Products misbranded as a matter of California and federal law. Misbranded products cannot be legally sold and are legally worthless.

**6.      Defendant Violates California Law By Using Unlawful Serving Sizes**

138.    In order to ensure uniformity and protect consumers from misleading schemes, identical California and Federal and regulations regulate the serving sizes that can be utilized on food labels. These regulations prohibit food manufacturers from understating the serving sizes of their products because such a practice would mislead consumers into the erroneous belief that a particular product had fewer calories and lower levels of undesirable nutrients like sugar or calories per serving than it actually did. Specifically, 21 C.F.R. § 101.9 contains special requirements for the manner in which nutritional information is conveyed. 21 C.F.R. § 101.9(b)(2) provides that serving size declared on a product label shall be determined from the "Reference Amounts Customarily Consumed Per Eating Occasion * * * *" (reference amounts) that appear in [21 C.F.R. §] 101.12(b).

139.    21 C.F.R. § 101.12 provides that the serving size for breath mints is 2 grams.

140.    Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements of 21 C.F.R. § 101.9 and 21 C.F.R. § 101.12 as its own.  California Health & Safety Code § 110100.

141.    In furtherance of their health and nutrition strategy Defendant has chosen not to use the correct serving size mandated by law in order to understate the calories in some of their breath mint products and call the product "sugar free."

142.    For example, the nutritional facts tables on the packages of Hershey's Ice Breaker mints specify a serving size of either 0.8 grams or 1 grams when the legally mandated serving size is at least 2 grams. This understatement of serving size leads to an understatement of the calories and sugar content of these products to the same degree that the serving size is understated. Thus, a breath mint whose stated serving size is 1 gram or one half the serving size mandated by the FDA will understate the calories in a serving size by a factor of two while a breath mint whose stated serving size is 1 gram or one half the serving size mandated by the FDA will understate the calories in a serving size by a factor of 2.5.

143.    In March 2004, the FDA issued a guidance letter to the food industry that indicated the FDA was concerned about the use of unlawful serving sizes. The letter stated:

> Dear Food Manufacturer:
> As you are aware, the Food and Drug Administration (FDA) is involved in an initiative to give consumers helpful information that will enable them to make more informed choices about their diets and lifestyle in an effort to reduce the incidence of overweight and obesity in the United States. A key component in providing nutrient information to consumers is the "Nutrition Facts" panel on food packages. In order for this nutrition information to be useful to consumers, it must be accurate and based on a meaningful amount of food. After the Nutrition Labeling and Education Act was enacted, thereby mandating nutrition labeling, FDA promulgated regulations that specify how serving size must be derived from an appropriate reference amount for the food commodity in question. We recognize that these regulations are very technical. However, FDA has determined that as part of the Obesity Initiative the agency will highlight accurate serving size declarations on food products as a priority. As a result, FDA intends to take appropriate action against violative products, especially when we encounter products that declare a serving size on its label that is substantially different than what it should be by regulation. Therefore, we are taking this opportunity to remind the food industry about the rules for determining an appropriate serving

size. Manufacturers must use the information provided in Title 21 of the Code of Federal Regulations (CFR) sections 101.9(b) and 101.12 to determine a specific serving size for their products….FDA encourages the food industry to review their nutrition information and assure that the serving size declared is appropriate for the commodity in question. FDA also encourages manufacturers to refer to our guidance documents at www.cfsan.fda.gov for additional information on serving sizes. FDA intends to make accurate serving size declarations one of our priorities and we will advise manufacturers when we encounter apparent errors in declared serving sizes.

144. Defendant ignored this FDA guidance and engaged in the exact unlawful serving size practices the FDA sought to eliminate.

145. In addition to the industry guidance Defendant ignored, the FDA has repeatedly taken enforcement action and issued warning letters addressing the type of misleading serving size representations described above.

146. Defendant ignored the FDA's repeated enforcement actions and issuance of warning letters and continued to use unlawful serving size claims on their product labels and in their advertising and marketing materials when they were prohibited from doing so.

147. A reasonable consumer would expect that when a manufacturer lists the serving size on its products, the serving size is the one required by law.

148. Plaintiff did not know, and had no reason to know, that Defendant's mint products were misbranded because Defendant failed to use the correct serving size.

149. Consumers are thus misled into purchasing Defendant's products with false and misleading serving sizes, which do not accurately depict the nature of the products. Plaintiff and the members of the Class relied on Defendant's serving sizes.

150. Had Plaintiff been aware that the serving sizes of the products he purchased were understated he would not have purchased the products. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products.

151. Defendant's claims in this respect are false and misleading and the products are in this respect misbranded under identical California and federal law, including California Health & Safety Code § 110725. Misbranded products cannot be legally sold and are legally worthless.

**7.** **Defendant Violates California Law By Failing To Label Its Product Ingredients By Their Common Names**

152.     In violation of identical California and federal law, Defendant misrepresented the ingredients in its chocolate products.

153.     Defendant did this by failing to list these ingredients in the ingredient statements by their common and usual name.

154.     Under California law "[a]ny food fabricated from two or more ingredients is misbranded unless it bears a label clearly stating the common or usual name of each ingredient" (California Health & Safety Code § 110725). California's law is identical to federal law on this point.

155.     Moreover, California has expressly adopted the federal regulations as it own. Thus California has adopted the requirements of 21 C.F.R. § 101.4 which mandate that the ingredient names listed on product labels be the common or usual name of those ingredients.

156.     In its guidance for industry and warning letters to manufacturers, the FDA has repeatedly stated its policy of restricting the ingredient names listed on product labels to their common or usual name, as provided in 21 C.F.R. § 101.4(a)(1).

157.     An ingredient's common or usual name is the name established by common usage or regulation, as provided in 21 C.F.R. § 102.5(d) which has been adopted by the State of California.

158.     The common or usual name must accurately describe the basic nature of the food or its characterizing properties or ingredients, as provided in 21 C.F.R. § 102.5(a).

159.     The purpose of these laws and regulations is to ensure that consumers are provided with accurate information about products and their ingredients so they can make informed purchasing decisions. Consumers can avoid chemicals and ingredients they wish to avoid in particular products and can select products that contain the ingredients consumers desire.

160.     Absent such disclosures and labeling practices, consumers cannot, except by luck or happenstance, avoid chemicals like the ones at issue here.

161.     Ignoring California law and its incorporated federal regulations and guidance, Defendant has mislabeled its Misbranded Food Products so that consumers are deprived of accurate information and, in fact, the Plaintiff and the members of the Class have been misled by Defendant's concealment of chemicals they wish to avoid in their food.

162.     For example, in its chocolate products, Defendant repeatedly failed to list the ingredient polyglycerol polyricinoleic acid by its common or usual name. Instead Defendant listed it by a non-common or usual name "PGPR".

163.     In listing PGPR as an ingredient, and failing to list the actual ingredient, polyglycerol polyricinoleic acid, by its common and usual name, Defendant not only misled the Plaintiff and the Class by concealing the presence of this chemical in its products, Defendant also violated California Health & Safety Code § 110725 and the federal regulations (21 C.F.R. §§ 101.4 and 102.5) that have been adopted as law by the State of California.  Specifically, Defendant has failed to disclose the presence of the polyglycerol polyricinoleic acid by its common or usual name, as required by California Health & Safety Code § 110725 and 21 C.F.R. §§ 101.4 and 102.5.

164.     A reasonable consumer would expect that when a manufacturer lists the ingredients on its products, the product's ingredients are given their common or usual name as required by law.

165.     Plaintiff did not know, and had no reason to know, that Defendant's chocolate products were misbranded because they failed to list ingredients by the ingredients' common or usual name, despite identical California and federal regulations requiring that that the chemicals be listed as ingredients by their common and usual names.

166.     Consumers are thus misled into purchasing Defendant's products with false and misleading ingredient names, which do not describe the basic nature of the food or its characterizing properties or ingredients, as provided in California Health & Safety Code § 110725 and 21 C.F.R. §§ 101.4 and 102.5(a) both of which have been adopted as law by California.. Plaintiff and the other members of the Class relied on Defendant's labeling and ingredient lists.

167.    Had Plaintiff been aware that Defendant's chocolate products he purchased contained polyglycerol polyricinoleic acid he would not have purchased the products or knowingly used them as food. Plaintiff had other alternatives that lacked such ingredients and Plaintiff also had cheaper alternatives. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products.

168.    Defendant's claims in this respect are false and misleading and the products are in this respect misbranded under identical California and federal law, including California Health & Safety Code § 110725.  Misbranded products cannot be legally sold and are legally worthless.

**8.    Defendant Violates California Law By Failing to Adhere to the Requirements of the Standards of Identity For Its Products.**

169.    Identical California and federal law require foods to comply with specified standards of identity. Both California and federal law deem a food to be misbranded if it purports to be a standardized food (*e.g.*, milk chocolate, sweet chocolate or cocoa) but does not comply with the applicable standard of identity.

170.    Certain standards of identity require that particular optional ingredients, such as artificial flavorings or alkali ingredients, be declared in a specified manner on the label in conjunction with the name of the standardized food.

171.    Hershey's milk chocolate and sweet chocolate products violate 21 C.F.R. § 163.130 because these products contain vanillin, an artificial ingredient, but fail to disclose this fact as required by the standard of identity.

172.    21 C.F.R. § 163.130 provides that:

When one or more of the spices, flavorings, or seasonings specified in paragraph (b)(3) of this section are used in the breakfast cocoa [sic], the label shall bear an appropriate statement, e.g., "Spice added", "Flavored with ___", or "With ___ added", the blank being filled in with the common or usual name of the spice, flavoring, or seasoning used, in accordance with 101.22 of this chapter….

Whenever the name of the food appears on the label so conspicuously as to be easily seen under customary conditions of purchase, the statements prescribed in this paragraph showing optional ingredients used shall precede or follow such name without intervening printed or graphic matter.

173.     Hershey fails to do this. Thus, for example, the Hershey's Milk Chocolate purchased by the Plaintiff purports to be milk chocolate and is labeled as such on the principal display panel yet the product contains vanillin, an artificial ingredient, not found in better chocolate. The disclosure statements mandated by 21 C.F.R. 163.130 are not present on the label, however.

174.     Similarly, 21 C.F.R. § 163.123 provides that:

When optional alkalizing ingredients are used in the preparation of the chocolate liquor or the cacao nibs from which the chocolate was prepared, the label shall bear the statement "Processed with alkali", or "Processed with ___", the blank being filled in with the common or usual name of the specific alkali ingredient used in the food. …

When one or more of the spices, flavorings, or seasonings specified in paragraph (b)(3) of this section are used in the breakfast cocoa [sic], the label shall bear an appropriate statement, e.g., "Spice added", "Flavored with ___", or "With ___ added", the blank being filled in with the common or usual name of the spice, flavoring, or seasoning used, in accordance with 101.22 of this chapter.

When two or more of the statements set forth in this paragraph are required, such statements may be combined in a manner that is appropriate, but not misleading.

Whenever the name of the food appears on the label so conspicuously as to be easily seen under customary conditions of purchase, the statements prescribed in this paragraph showing optional ingredients used shall precede or follow such name without intervening printed or graphic matter.

175.     Hershey fails to do this. Thus, for example, the Hershey's Dark Chocolate kisses and Special Dark Chocolate bar purchased by the Plaintiff purport to be sweet chocolate and are labeled as such on the principal display panels, yet the products contain alkali ingredients and vanillin, an artificial ingredient not found in better chocolate. The disclosure statements mandated by 21 C.F.R. 163.123 are not present on the label, however.

176.     Similarly, 21 C.F.R. § 163.113 requires that the label of cocoa products follow the labeling requirements of 21 C.F.R. § 163.112.  21 C.F.R. § 163.113 provides that:

When optional alkalizing ingredients are used in the preparation of the chocolate liquor or the cacao nibs from which the chocolate was prepared, the label shall bear the statement "Processed with alkali", or "Processed with ___", the blank being filled in with the common or usual name of the specific alkali ingredient used in the food. …

1
2
3

Whenever the name of the food appears on the label so conspicuously as to be easily seen under customary conditions of purchase, the statements prescribed in this paragraph showing optional ingredients used shall precede or follow such name without intervening printed or graphic matter.

4   177.   Hershey fails to do this. Thus, for example, the Hershey Special Dark Cocoa

5   purchased by the Plaintiff purports to be cocoa and is labeled as such on the principal display

6   panel yet the products contain alkali ingredients The disclosure statements mandated by 21 C.F.R.

7   163.123 are not present on the label, however.

8   178.   The Plaintiff relied on these labeling statements and expected the products to

9   comply with the standards of identity mandated by law. Plaintiff and the Class were misled

10  because they purchased products that contained synthetic artificial ingredients not found in similar

11  products. Plaintiff and the class paid a premium for these misbranded products. Plaintiff and the

12  Class would not have bought these products if they had been labeled in accordance with the

13  appropriate standards of identity. Because the products were not labeled in accordance with the

14  standards of identity, they were misbranded. Misbranded products cannot be sold or held. They are

15  worthless.

16  **D.   Defendant Has Violated California Law By Manufacturing, Advertising, Distributing And Selling Misbranded Food Products**

17

18  179.   Defendant has manufactured, advertised, distributed and sold products that are

19  misbranded under California law. Misbranded products cannot be legally manufactured,

20  advertised, distributed, sold, or held and are legally worthless as a matter of law.

21  180.   Defendant has violated California Health & Safety Code §§ 109885 and 110390

22  which make it unlawful to disseminate false or misleading food advertisements that include

23  statements on products and product packaging or labeling or any other medium used to directly or

24  indirectly induce the purchase of a food product.

25  181.   Defendant has violated California Health & Safety Code § 110395 which makes it

26  unlawful to manufacture, sell, deliver, hold or offer to sell any misbranded food.

27  Defendant has violated California Health & Safety Code § 110398 which makes it unlawful to

28  deliver or proffer for delivery any food that has been falsely advertised.

Defendant has violated California Health & Safety Code § 110403 which prohibits the advertisement of products that are represented to have any effect on enumerated conditions, disorders and diseases including cancer and heart diseases unless it has federal approval.

Defendant has violated California Health & Safety Code § 110660 because its labeling is false and misleading.

182. Defendant's Misbranded Food Products are misbranded under California Health & Safety Code § 110665 because their labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and the regulations adopted thereto.

183. Defendant's Misbranded Food Products are misbranded under California Health & Safety Code § 110670 because their labeling fails to conform with the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and the regulations adopted thereto.

184. Defendant's Misbranded Food Products are misbranded under California Health & Safety Code § 110705 because words, statements and other information required by the Sherman Law to appear on their labeling either are missing or not sufficiently conspicuous.

185. Defendant's Misbranded Food Products are misbranded under California Health & Safety Code § 110725 because they fail to bear labels clearly stating the common or usual name of each ingredient they contain.

186. Defendant's Misbranded Food Products are misbranded under California Health & Safety Code § 110740 because they contain artificial flavoring, artificial coloring and chemical preservatives but fail to adequately disclose that fact on the labeling. Defendant has violated California Health & Safety Code § 110760 which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.

187. Defendant has violated California Health & Safety Code § 110765 which makes it unlawful for any person to misbrand any food.

188. Defendant has violated California Health & Safety Code § 110770 which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

190. Defendant has violated the standard set by 21 C.F.R. § 101.2, 101.4, 101.9, 101.12, 101.22, 102.5 all of which have been adopted and incorporated by reference in the Sherman Law, by failing to include on its product labels the nutritional information required by law.

191. Defendant has violated the standards set by 21 CFR §§ 101.13, 101.14, and 101.54 which have been adopted and incorporated by reference in the Sherman Law, by including unauthorized antioxidant and nutrient content claims on its products.

Defendant has violated the standards set by 21 CFR §§ 101.14, and 101.65, which have been adopted by reference in the Sherman Law, by including unauthorized health and healthy claims on their products.

192. By selling products that are high in sodium, cholesterol, fat, and saturated fat, while failing to properly disclose that fact, Defendant has violated and continues to violate federal laws and regulations prohibiting the misbranding of food products including those in 21 U.S.C. § 343, which have been adopted by reference in the Sherman Law.

193. Defendant has violated 201(g)(1)(B) of the Act [21 U.S.C. § 321(g)(1)(B) by misbranding its chocolates as being intended for the diagnosis, cure, mitigation, treatment, or prevention of disease thereby establishing that the products are unapproved "new drugs" as defined by 21 U.S.C. § 321(p) which were not given prior approval by the FDA as described in 21 U.S.C. § 355 (a).

**E.     Plaintiff Purchased Defendant's Misbranded Food Products**

194. Plaintiff cares about the nutritional content of his food and seeks to maintain a healthy diet.

195. Plaintiff purchased Hershey's Misbranded Food Products at issue in this Amended Complaint, including Hershey's milk chocolate, dark chocolate, cocoa and sugar free mint products, since 2008 and throughout the Class Period. Plaintiff has spent more than twenty-five dollars ($25.00) on Defendant's Misbranded Food Products during the Class Period.

196. Plaintiff purchased the following Hershey's Misbranded Food Products:

Special Dark Chocolate Bar, Special Dark Kisses, Special Dark Cocoa, Natural Unsweetened Cocoa, Milk Chocolate Bar, and Sugar Free Coolmint Ice Breaker Mints.

197.    As a result of Hershey's misrepresentations, Plaintiff and thousands of others in California purchased the products at issue.

198.    Plaintiff read the labels on Defendant's Misbranded Food Products, including the serving sizes, ingredients, antioxidant, nutrient content, sugar free and health claims, before purchasing them.

199.    Plaintiff relied on Defendant's package labeling including the serving sizes, ingredients, antioxidant, nutrient content, sugar free and health claims, and based and justified the decision to purchase Defendant's products in substantial part on Defendant's package labeling including the antioxidant, nutrient content and health claims.

200.    At point of sale, Plaintiff did not know, and had no reason to know, that Defendant's products were misbranded as set forth herein, and would not have bought the products had he known the truth about them.

201.    At point of sale, Plaintiff did not know, and had no reason to know, that Defendant's labeling claims including the serving sizes, ingredients, antioxidant, sugar free, health and nutrient content claims were unlawful and unauthorized as set forth herein, and would not have bought the products had he known the truth about them.

202.    As a result of Defendant's unlawful labeling claims, Plaintiff and thousands of others in California and throughout the United States purchased the Misbranded Food Products at issue.

203.    Defendant's labeling, advertising and marketing as alleged herein are false and misleading and were designed to increase sales of the products at issue. Defendant's misrepresentations are part of an extensive labeling, advertising and marketing campaign, and a reasonable person would attach importance to Defendant's representations in determining whether to purchase the products at issue.

204.    A reasonable person would also attach importance to whether Defendant's products were legally salable, and capable of legal possession, and to Defendant's representations about these issues in determining whether to purchase the products at issue. Plaintiff would not have purchased Defendant's Misbranded Food Products had he known they were not capable of being

legally sold or held and did not possess the characteristics or nutritional attributes they were falsely represented to have by Defendant.

205. Defendants' Misbranded Food Products 1) whose essential characteristics had been misrepresented by Defendant; 2) which had their nutritional and health benefits misrepresented and overstated by Defendant, and 3) which were misbranded products which could not be resold and whose very possession was illegal, were worthless to the Plaintiff and as a matter of law.

## CLASS ACTION ALLEGATIONS

206. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

> All persons in California who purchased chocolate, cocoa and sugar free mint products manufactured or distributed by Hershey within the last four years (the "Class").

207. The following persons are expressly excluded from the Class: (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

208. This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

209. <u>Numerosity</u>: Based upon Hershey's publicly available sales data with respect to the misbranded products at issue, it is estimated that the Class number in the thousands, and that joinder of all Class members is impracticable.

210. <u>Common Questions Predominate</u>: This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members. Thus, proof of a common set of facts will establish the right of each Class member to recover. Questions of law and fact common to each Class member include, for example:

> a. Whether Defendant engaged in unlawful, unfair or deceptive business practices by failing to properly package and label its Misbranded Food Products sold to consumers;

-51-
*Amended Class Action Complaint*

b.    Whether the food products at issue were misbranded or unlawfully packaged and labeled as a matter of law;

c.    Whether Defendant made unlawful and misleading nutrient content claims, health claims, sugar free claims and/or antioxidant claims with respect to its food products sold to consumers;

d.    Whether Defendant used unlawful and misleading nutritional information and statements of identity;

e.    Whether Defendant violated California Bus. & Prof. Code § 17200, *et seq*., California Bus. & Prof. Code § 17500 *et seq*., the Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq*., and the Sherman Law;

f.    Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

g.    Whether Defendant's unlawful, unfair and/or deceptive practices harmed Plaintiff and the Class; and

h.    Whether Defendant was unjustly enriched by its deceptive practices.

211.    <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the Class because they bought Defendant's Misbranded Food Products during the Class Period.  Defendant's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.  Plaintiff and the Class sustained similar injuries arising out of Defendant's conduct in violation of California law.  The injuries of each member of the Class were caused directly by Defendant's wrongful conduct.  In addition, the factual underpinning of Defendant's misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class.  Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

212.    <u>Adequacy</u>:  Plaintiff will fairly and adequately protect the interests of the Class.  Neither Plaintiff nor his counsel have any interests that conflict with or are antagonistic to the interests of the Class members.  Plaintiff has retained highly competent and experienced class action attorneys to represent his interests and those of the members of the Class.  Plaintiff and

Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and his counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

213. <u>Superiority</u>: There is no plain, speedy or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

214. The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole. Plaintiff and his counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Business and Professions Code § 17200, *et seq.***
**Unlawful Business Acts and Practices**

215. Plaintiff incorporates by reference each allegation set forth above.

216. Defendant's conduct constitutes unlawful business acts and practices.

217. Defendant sold Misbranded Food Products in California during the Class period.

218. Defendant is a corporation and, therefore, is a "person" within the meaning of the Sherman Law.

219. Defendant's business practices are unlawful under § 17200, *et seq.* by virtue of Defendant's violations of the advertising provisions of the Sherman Law (Article 3) and the misbranded food provisions of the Sherman Law (Article 6).

220. Defendant's business practices are unlawful under § 17200, *et seq.* by virtue of Defendant's violations of the Consumer Legal Remedies Act, Cal. Civ. Code. § 1750 *et seq.* Defendant's business practices are unlawful under § 17200, *et seq.* by virtue of Defendant's violations of § 17500, *et seq.*, which forbids untrue and misleading advertising.

221. Defendant sold Plaintiff and the Class Misbranded Food Products that were not capable of being sold legally and which were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

222. As a result of Defendant's illegal business practices, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and to restore to any Class Member any money paid for the Misbranded Food Products.

223. Defendant's unlawful business acts present a threat and reasonable continued likelihood of injury to Plaintiff and the Class.

224. As a result of Defendant's conduct, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by

*Amended Class Action Complaint*

Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Hershey Misbranded Food Products by Plaintiff and the Class.

### SECOND CAUSE OF ACTION
#### Business and Professions Code § 17200, *et seq.*
#### Unfair Business Acts and Practices

225. Plaintiff incorporates by reference each allegation set forth above.

226. Defendant's conduct as set forth herein constitutes unfair business acts and practices.

227. Defendant sold Misbranded Food Products in California during the Class Period. Plaintiff and members of the Class suffered a substantial injury by virtue of buying Defendant's Misbranded Food Products that they would not have purchased absent Defendant's illegal conduct as set forth herein.

228. Defendant's deceptive marketing, advertising, packaging and labeling of its Misbranded Food Products and its sale of unsalable Misbranded Food Products that were illegal to possess were of no benefit to consumers, and the harm to consumers and competition is substantial.

229. Defendant sold Plaintiff and the Class Misbranded Food Products that were not capable of being legally sold or held and that were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

230. Plaintiff and the Class who purchased Defendant's Misbranded Food Products had no way of reasonably knowing that the products were misbranded and were not properly marketed, advertised, packaged and labeled, and thus could not have reasonably avoided the injury each of them suffered.

231. The consequences of Defendant's conduct as set forth herein outweighs any justification, motive or reason therefor. Defendant's conduct is and continues to be immoral, unethical, illegal and unscrupulous, contrary to public policy, and is substantially injurious to Plaintiff and the Class.

232.    As a result of Defendant's conduct, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Hershey Misbranded Food Products by Plaintiff and the Class.

233.    As a result of Defendant's conduct, Plaintiffs and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiffs and the Class

### THIRD CAUSE OF ACTION
### Business and Professions Code § 17200, *et seq.*
### Fraudulent Business Acts and Practices

234.    Plaintiff incorporates by reference each allegation set forth above.

235.    Defendant's conduct as set forth herein constitutes fraudulent business practices under California Business and Professions Code sections § 17200, *et seq.*

236.    Defendant sold Misbranded Food Products in California during the Class Period. Defendant's misleading marketing, advertising, packaging and labeling of the Misbranded Food Products and its misrepresentations that the products at issue were salable, capable of legal possession and not misbranded were likely to deceive reasonable consumers, and in fact, Plaintiff and members of the Class were deceived. Defendant has engaged in fraudulent business acts and practices.

237.    Defendant's fraud and deception caused Plaintiff and the Class to purchase Hershey Misbranded Food Products that they would otherwise not have purchased had they known the true nature of those products.

238.    Defendant sold Plaintiff and the Class Misbranded Food Products that were not capable of being sold legally or held and that were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

239. As a result of Defendant's conduct as set forth herein, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Hershey Misbranded Food Products by Plaintiff and the Class.

**FOURTH CAUSE OF ACTION**
**Business and Professions Code § 17500, *et seq.***
**<u>Misleading and Deceptive Advertising</u>**

240. Plaintiff incorporates by reference each allegation set forth above.

241. Plaintiff asserts this cause of action for violations of California Business and Professions Code § 17500*, et seq.* for misleading and deceptive advertising against Defendant. Defendant sold Misbranded Food Products in California during the Class period.

242. Defendant engaged in a scheme of offering the Misbranded Food Products for sale to Plaintiff and members of the Class by way of, *inter alia*, product packaging and labeling, and other promotional materials. These materials misrepresented and/or omitted the true contents and nature of the Hershey Misbranded Food Products. Defendant's advertisements and inducements were made within California and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.* in that such product packaging and labeling, and promotional materials were intended as inducements to purchase the Hershey Misbranded Food Products and are statements disseminated by Defendant to Plaintiff and the Class that were intended to reach members of the Class. Defendant knew, or in the exercise of reasonable care should have known, that these statements were misleading and deceptive as set forth herein.

243. In furtherance of its plan and scheme, Defendant prepared and distributed within California product packaging and labeling, and other promotional materials, statements that misleadingly and deceptively represented the ingredients contained in and the nature of Defendant's Misbranded Food Products. Plaintiff and the Class necessarily and reasonably relied on Defendant's materials, and were the intended targets of such representations.

244. Defendant's conduct in disseminating misleading and deceptive statements in

California to Plaintiff and the Class was and is likely to deceive reasonable consumers by obfuscating the true ingredients and nature of Defendant's Misbranded Food Products in violation of the "misleading prong" of California Business and Professions Code § 17500, *et seq.*

245. As a result of Defendant's violations of the "misleading prong" of California Business and Professions Code § 17500, *et seq.*, Defendant has been unjustly enriched at the expense of Plaintiff and the Class. Misbranded products cannot be legally sold or held and are legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

246. Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

**FIFTH CAUSE OF ACTION**
**Business and Professions Code § 17500, *et seq.***
**Untrue Advertising**

247. Plaintiff incorporates by reference each allegation set forth above.

248. Plaintiff asserts this cause of action against Defendant for violations of California Business and Professions Code § 17500, *et seq.*, regarding untrue advertising.

249. Defendant sold mislabeled and Misbranded Food Products in California during the Class period.

250. Defendant engaged in a scheme of offering the Misbranded Food Products for sale to Plaintiff and the Class by way of product packaging and labeling, and other promotional materials. These materials misrepresented and/or omitted the true contents and nature of Defendant's Misbranded Food Products. Defendant's advertisements and inducements were made in California and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.* in that the product packaging and labeling, and promotional materials were intended as inducements to purchase the Hershey Misbranded Food Products, and are statements disseminated by Defendant to Plaintiff and the Class. Defendant knew, or in the exercise of reasonable care should have known, that these statements were untrue.

*Amended Class Action Complaint*

251.    In furtherance of its plan and scheme, Defendant prepared and distributed in California and nationwide via product packaging and labeling, and other promotional materials, statements that falsely advertise the ingredients contained in the Hershey Misbranded Food Products, and falsely misrepresented the nature of those products.  Plaintiff and the Class were the intended targets of such representations and would reasonably be deceived by Defendant's materials.

252.    Defendant's conduct in disseminating untrue advertising throughout California and nationwide deceived Plaintiff and members of the Class by obfuscating the contents, nature and quality of the Hershey Misbranded Food Products in violation of the "untrue prong" of California Business and Professions Code § 17500.

253.    As a result of Defendant's violations of the "untrue prong" of California Business and Professions Code § 17500, *et seq.*, Defendant has been unjustly enriched at the expense of Plaintiff and the Class.  Misbranded products cannot be legally sold or held and are legally worthless. Plaintiff and the Class paid a premium price for the subject Misbranded Food Products.

254.    Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

### SIXTH CAUSE OF ACTION
### Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*

255.    Plaintiff incorporates by reference each allegation set forth above.

256.    This cause of action is brought pursuant to the CLRA.  Defendant's violations of the CLRA were and are willful, oppressive and fraudulent, thus supporting an award of punitive damages.

257.    Plaintiff and the Class are entitled to actual and punitive damages against Defendant for its violations of the CLRA.  In addition, pursuant to Cal. Civ. Code § 1782(a)(2), Plaintiffs and the Class are entitled to an order enjoining the above-described acts and practices,

1    providing restitution to Plaintiff and the Class, ordering payment of costs and attorneys' fees, and
2    any other relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code § 1780.

3        258.    Defendant's actions, representations and conduct have violated, and continue to
4    violate the CLRA, because they extend to transactions that are intended to result, or which have
5    resulted, in the sale of goods or services to consumers.

6        259.    Defendant sold Misbranded Food Products in California during the Class Period.

7        260.    Plaintiff and members of the Class are "consumers" as that term is defined by the
8    CLRA in Cal. Civ. Code §1761(d).

9        261.    Defendant's Misbranded Food Products were and are "goods" within the meaning
10   of Cal. Civ. Code §1761(a).

11       262.    By engaging in the conduct set forth herein, Defendant violated and continues to
12   violate Section 1770(a)(5), of the CLRA, because Defendant's conduct constitutes unfair methods
13   of competition and unfair or fraudulent acts or practices, in that it misrepresents the particular
14   ingredients, characteristics, uses, benefits and quantities of the goods.

15       263.    By engaging in the conduct set forth herein, Defendant violated and continues to
16   violate Section 1770(a)(7) of the CLRA, because Defendant's conduct constitutes unfair methods
17   of competition and unfair or fraudulent acts or practices, in that it misrepresents the particular
18   standard, quality or grade of the goods.

19       264.    By engaging in the conduct set forth herein, Defendant violated and continues to
20   violate Section 1770(a)(9) of the CLRA, because Defendant's conduct constitutes unfair methods
21   of competition and unfair or fraudulent acts or practices, in that it advertises goods with the intent
22   not to sell the goods as advertised.

23       265.    By engaging in the conduct set forth herein, Defendant has violated and continues
24   to violate Section 1770(a)(16) of the CLRA, because Defendant's conduct constitutes unfair
25   methods of competition and unfair or fraudulent acts or practices, in that it represents that a subject
26   of a transaction has been supplied in accordance with a previous representation when they have
27   not.

28

266.    Plaintiff requests that the Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to Cal. Civ. Code § 1780(a)(2).  If Defendant is not restrained from engaging in these practices in the future, Plaintiff and the Class will continue to suffer harm.

267.    Pursuant to Section 1782(a) of the CLRA, on May 22, 2012, Plaintiff's counsel served Hershey with notice of Hershey's violations of the CLRA.  As authorized by Hershey's counsel, Plaintiffs' counsel served Hershey by certified mail, return receipt requested.    Hershey, through its counsel, acknowledged receipt of Plaintiffs' CLRA demand notice, by responding with a letter dated June 22, 2012.

268.    Hershey has failed to provide appropriate relief for its violations of the CLRA within 30 days of its receipt of the CLRA demand notice.  Accordingly, pursuant to Sections 1780 and 1782(b) of the CLRA, Plaintiff is entitled to recover actual damages, punitive damages, attorneys' fees and costs, and any other relief the Court deems proper.

269.    Plaintiffs make certain claims in this First Amended Complaint that were not included in the original Complaint filed on April 13, 2012, and were not included in Plaintiff's CLRA demand notice.

270.    This cause of action does not currently seek monetary relief and is limited solely to injunctive relief, as to Defendant's violations of the CLRA not included in the original Complaint. Plaintiff intends to amend this Complaint to seek monetary relief in accordance with the CLRA after providing Defendant with notice of Plaintiff's new claims pursuant to Cal. Civ. Code § 1782.

271.    At the time of any amendment seeking damages under the CLRA, Plaintiff will demonstrate that the violations of the CLRA by Defendant were willful, oppressive and fraudulent, thus supporting an award of punitive damages.

272.    Consequently, Plaintiff and the Class will be entitled to actual and punitive damages against Defendant for its violations of the CLRA.  In addition, pursuant to Cal. Civ. Code § 1782(a)(2), Plaintiff and the Class will be entitled to an order enjoining the above-described acts and practices, providing restitution to Plaintiff and the Class, ordering payment of costs and

attorneys' fees, and any other relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code § 1780.

## SEVENTH CAUSE OF ACTION
### Restitution Based on Unjust Enrichment/Quasi-Contract

273.    Plaintiff incorporates by reference each allegation set forth above.

274.    As a result of Defendant's unlawful, fraudulent and misleading labeling, advertising, marketing and sales of Defendant's Misbranded Food Products, Defendant was enriched at the expense of Plaintiff and the Class.

275.    Defendant sold Misbranded Food Products to Plaintiff and the Class that were not capable of being sold or held legally and which were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

276.    It would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits they received from Plaintiff and the Class, in light of the fact that the products were not what Defendant represented them to be. Thus, it would be unjust and inequitable for Defendant to retain the benefit without restitution to Plaintiff and the Class of all monies paid to Defendant for the products at issue.

277.    As a direct and proximate result of Defendant's actions, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### Beverly-Song Act (Cal. Civ. Code § 1790, *et seq.*)

278.    Plaintiff incorporates by reference each allegation set forth above.

279.    Plaintiff and members of the Class are "buyers" as defined by Cal. Civ. Code § 1791(b).

280.    Defendant is a "manufacturer" and "seller" as defined by Cal. Civ. Code § 1791(j) & (l).

281.    Defendant's food products are "consumables" as defined by Cal. Civ. Code § 1791(d).

282.    Defendant's nutrient and health content claims constitute "express warranties" as

*Amended Class Action Complaint*

defined by Cal. Civ. Code § 1791.2.

283.     Defendant, through its package labels, creates express warranties by making the affirmation of fact and promising that its Hershey Misbranded Food Products comply with food labeling regulations under California and federal law.

284.     Despite Defendant's express warranties regarding its food products, it does not comply with food labeling regulations under California and federal law.

285.     Defendant breached its express warranties regarding its Misbranded Food Products in violation of Cal. Civ. Code § 1790, *et seq.*

286.     Defendant sold Plaintiff and members of the Class Misbranded Food Products that were not capable of being sold or held legally and which were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

287.     As a direct and proximate result of Defendant's actions, Plaintiff and the Class have suffered damages in an amount to be proven at trial pursuant to Cal. Civ. Code § 1794.

288.     Defendant's breaches of warranty were willful, warranting the recovery of civil penalties pursuant to Cal. Civ. Code § 1794.

## NINTH CAUSE OF ACTION
## Magnuson-Moss Act (15 U.S.C. § 2301, *et seq.*)

289.     Plaintiff incorporates by reference each allegation set forth above.

290.     Plaintiff and members of the Class are "consumers" as defined by 15 U.S.C. § 2301(3).

291.     Defendant is a "supplier" and "warrantor" as defined by 15 U.S.C. § 2301(4) & (5).

292.     Defendant's food products are "consumer products" as defined by 15 U.S.C. § 2301(1).

293.     Defendant's nutrient and health content claims create "express warranties."

294.     Defendant, through its package labels, creates express warranties by making the affirmation of fact and promising that its Misbranded Food Products comply with food labeling regulations under California and federal law.

295.    Despite Defendant's express warranties regarding its food products, it does not comply with food labeling regulations under California and federal law.

296.    Defendant breached its express warranties regarding its Misbranded Food Products in violation of 15 U.S.C. §§ 2301, *et seq.*

297.    Defendant sold Plaintiff and members of the Class Misbranded Food Products that were not capable of being sold or held legally and which were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

278.    As a direct and proximate result of Defendant's actions, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of his and the Class' claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, and on behalf of the general public, prays for judgment against Defendant as follows:

A.    For an order certifying this case as a class action and appointing Plaintiff and his counsel to represent the Class;

B.    For an order awarding, as appropriate, damages, restitution or disgorgement to Plaintiff and the Class;

C.    For an order requiring Defendant to immediately cease and desist from selling its Misbranded Food Products in violation of law; enjoining Defendant from continuing to market, advertise, distribute, and sell these products in the unlawful manner described herein; and ordering Defendant to engage in corrective action;

D.    For all remedies available pursuant to Cal. Civ. Code § 1780;

E.    For an order awarding attorneys' fees and costs;

F.    For an order awarding punitive damages;

G.    For an order awarding pre-and post-judgment interest; and

H.    For an order providing such further relief as this Court deems proper.


Dated:  July 23, 2012.            Respectfully submitted,


                                   /s/ Ben F. Pierce Gore
                                  Ben F. Pierce Gore (SBN 128515)
                                  PRATT & ASSOCIATES
                                  1901 S. Bascom Avenue, Suite 350
                                  Campbell, CA  95008
                                  Telephone:  (408) 429-6506
                                  Fax:  (408) 369-0752
                                  pgore@prattattorneys.com

                                  Jay Nelkin
                                  Carol Nelkin
                                  Stuart M. Nelkin
                                  NELKIN & NELKIN, P.C.
                                  5417 Chaucer Drive
                                  P.O. Box 25303
                                  Houston, Texas 77005
                                  Telephone:  (713) 526-4500
                                  Facsimile:  (713) 526-8915
                                  jnelkin@nelkinpc.com
                                  cnelkin@nelkinpc.com
                                  snelkin@nelkinpc.com

                                  Don Barrett
                                  David McMullan, Jr.
                                  Brian Herrington
                                  Katherine B. Riley
                                  BARRETT LAW GROUP, P.A.
                                  P.O. Box 927
                                  404 Court Square North
                                  Lexington, MS 39095
                                  Telephone: (662) 834-2488
                                  Toll Free: (877) 816-4443
                                  Fax: (662) 834-2628
                                  dbarrett@barrettlawgroup.com
                                  donbarrettpa@yahoo.com
                                  bherrington@barrettlawgroup.com
                                  kbriley@barrettlawgroup.com
                                  kbriphone@yahoo.com
                                  dmcmullan@barrettlawgroup.com

                                  Charles Barrett
                                  CHARLES BARRETT, P.C.
                                  6518 Hwy. 100, Suite 210
                                  Nashville, TN 37205
                                  Telephone: (615) 515-3393
                                  Fax: (615) 515-3395
                                  charles@cfbfirm.com

*Amended Class Action Complaint*

Richard Barrett
LAW OFFICES OF RICHARD R. BARRETT, PLLC
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: (662) 380-5018
Fax: (866) 430-5459
rrb@rrblawfirm.net

J. Price Coleman
COLEMAN LAW FIRM
1100 Tyler Avenue, Suite 102
Oxford, MS 38655
Telephone: (662) 236-0047
Fax: (662) 513-0072
colemanlawfirmpa@bellsouth.net

Dewitt M. Lovelace
Alex Peet
LOVELACE LAW FIRM, P.A.
12870 U.S. Hwy 98 West, Suite 200
Miramar Beach, FL 32550
Telephone: (850) 837-6020
Fax: (850) 837-4093
dml@lovelacelaw.com

David Shelton
ATTORNEY AT LAW
1223 Jackson Avenue East, Suite 202
Oxford, MS 38655
Telephone: (662) 281-1212
Fax: (662) 281-1312
david@davidsheltonpllc.com

Keith M. Fleischman
Frank Karam
Ananda N. Chaudhuri
FLEISCHMAN LAW FIRM
565 Fifth Avenue, 7th Floor
New York, New York 10017
Telephone: 212-880-9571
keith@fleischmanlawfirm.com
frank@fkaramlaw.com
achaudhuri@fleischmanlawfirm.com

Zona Jones
Darren Brown
PROVOST UMPHREY LAW FIRM LLP
490 Park Street
P.O. Box 4905
Beaumont, TX 77704
Telephone: (409) 299-5178
zjones@provostumphrey.com
dbrown@provostumphrey.com

*Attorneys for Plaintiff*